UNITED STATES of America, Plaintiff,

v.

Greg DAVIS, et al., Defendants.

No. CR 88–36(a) JSL.

United States District Court,
C.D. California.

June 30, 1989.

Greg Davis and David Chesnoff, Las Vegas, Nev., Alfredo Chavaria–Castaneda and Jeffrey Pope, West Covina, Cal., Robert Acevedes–Ramirez and Jerry Scotti, Beverly Hills, Cal., and Moises Negron, Jr. and

Byron C. Thompson, Oakland, Cal., for defendants.

Tom Umberg, Asst. U.S. Atty., Santa Ana, Cal., for plaintiff.

## OPINION AND ORDER

LETTS, District Judge.

■ The issue presented by this case is whether the Sentencing Guidelines, 18 U.S.C.A. §§ 3551–3742 (West 1985 & Supp. 1989) and 28 U.S.C.A. §§ 991–998 (West Supp.1989) (the "Guidelines"), can be applied without violating the Due Process Clause of the Fifth Amendment. This court holds that they cannot.

## FACTS

On October 25, 1988, a federal jury found defendant Greg Davis and three co-defendants, Alfredo Chavaria–Castaneda, Robert Acevedes–Ramirez and Moises Negron, Jr., guilty of conspiracy and other crimes arising out of their attempt to purchase cocaine.[1] None of the defendants testified at trial. The Government's evidence included testimony that the attempt was made in the course of a "sting" operation in which a special agent of the Federal Drug Enforcement Agency ("the Agent") agreed to supply the cocaine and the defendants agreed to bring money to a specified place of exchange. When the defendants later attempted to make the exchange, they were arrested.

Pursuant to the Sentencing Guidelines, the probation office prepared a Presentence Investigation Report (the "Presentence Report") prior to sentencing. Davis refused to discuss the offense with the probation officer, first because he could not reach his counsel,[2] and then on advice of counsel.

Davis was arrested, tried and convicted under the name "Greg Davis." According to the Presentence Report, fingerprint identification indicated that Davis' true name is "David Preston Hollier."[3] While no criminal record was found under the name of "Greg Davis," "David Preston Hollier" has a substantial criminal history.[4]

Under the Guidelines, the specific drug offenses for which Davis was convicted requires confinement for periods ranging from 10 months[5] to life imprisonment. In the Presentence Report, the probation officer determined that the applicable guideline range within which Davis should be incarcerated was from 360 months to life. The total offense level upon which this determination was made was calculated as follows: (1) Base Level Offense—36 points; (2) Adjustment for Role in the Offense—plus four points; (3) Obstruction of Justice—plus two points; (4) Acceptance of Respon-

1. Specifically, defendants Davis, Castaneda, and Negron were convicted of violating 21 U.S.C. §§ 841(a)(1), 846 (1982) (attempt to possess and conspiracy to possess with intent to distribute a controlled substance). Defendant Ramirez was convicted solely of the attempt charge. Additionally, defendant Davis was convicted of 21 U.S.C. § 843(b) (1982) (use of a communication facility in furtherance of a felony). All of the defendants have appealed their convictions.

2. At the time of the presentence interview, Davis was in the custody of the Federal Correctional Institution at Terminal Island, and Davis' counsel, whose professional offices are in Las Vegas, Nevada, was hospitalized for surgery.

3. For purposes of clarity, this opinion will continue to refer to this defendant as "Davis."

4. Davis' adult criminal record consists solely of three convictions for driving without a license. In addition, however, he has a history of at least 13 adult arrests on various charges. All of these charges had been dropped or dismissed by the time of the arrest in this case, except one for possession of rock cocaine with intent to distribute. This charge remains pending.

As a juvenile, Davis had several convictions in Louisiana, including second degree murder, apparently committed when Davis was 15 years old. This latter conviction appears to have been a brutal murder, committed while Davis was burglarizing the victim's home. In their guilty pleas, Davis and his accomplice each accused the other of the actual murderous act. Apparently because of application of the "felony-murder" rule, the issue was not resolved. A supplement to the Presentence Report, however, gives reason to believe that Davis was in fact the murderer.

5. This assumes that less than 25 grams of cocaine (or other Schedule I or II amphetamine) was involved, that the defendant fell into a Criminal History Category of I, and that no other enhancements were made to the Base Offense Level of 12.

sibility—no reduction. Davis received one point each for three vehicle code violations, which placed him in Criminal History Category II.[6]

Davis now challenges the Sentencing Guidelines on Fifth Amendment due process grounds.[7]

OVERVIEW

The Guidelines require courts to apply certain factors in determining the term of incarceration to be imposed upon defendants convicted in criminal cases. To determine which of the factors are applicable, a court must decide numerous questions of fact. The available information upon which a court must rely in making these determinations is often by necessity sparse, biased or otherwise inadequate. The court is nevertheless *required* to apply the factors found to be applicable in accordance with fixed predetermined weights. *See generally* United States Sentencing Commission, *Guidelines Manual*, §§ 1B1.-1–1B1.9, at 1.13 (hereinafter *"Guidelines Manual"*).[8] The Guidelines provide no means for altering these weights to reflect relative uncertainties of the underlying facts.

It is important to distinguish the issue decided here from the much larger issues which have tended to dominate the general discussion of the Guidelines.[9] The issue here is not whether due process requires that every criminal sentence be imposed individually through the exercise of judicial discretion. This issue is significant, but it need not be addressed here. The issue also is not whether Congress has the power to

limit the scope of judicial discretion in sentencing or even to eliminate such discretion completely.

The court here assumes, without deciding, that Congress does have the Constitutional power to eliminate judicial discretion as an element of sentencing. It could accomplish this simply by providing mandatory fixed periods of incarceration applicable equally to all who are convicted of specified crimes. The court also assumes, *a fortiori*, that Congress has the power to limit the scope of judicial discretion without completely eliminating it. This could be accomplished lawfully by establishing maximum and minimum penalties applicable to specific crimes. In this regard, the court further assumes that Congress would have absolute discretion in fixing the spread between such penalties. Finally, the court assumes that Congress has the power to direct any discretion left to courts for sentencing purposes by requiring judges to consider certain sentencing factors, if determined to be applicable, and to require imposition of at least a minimum period of incarceration for the underlying offense.

The general discussion surrounding the Guidelines has suggested that the Guidelines limit a court's discretion in sentencing no further than the court here assumes Congress may. The suggestion is that the Guidelines merely narrow the previously unfettered discretion of judges by forcing them to adopt a more structured mode for their decision-making.

This suggestion, while accurate to a point, hides a far more harsh reality. It is

---

**6.** Davis' arrest record and juvenile offenses were properly excluded from the computation of the Criminal History Category.

**7.** Davis also raises a Sixth Amendment argument regarding right to counsel. While this is an important point, the facts alleged by Davis in support of his Sixth Amendment claim are in dispute, and so are not yet ripe for decision.

**8.** Throughout the text of the Guidelines, the use of mandatory language indicates that sentencing judges do not retain discretion to consider some factors while disregarding others.

**9.** Since their promulgation, the Guidelines have been challenged on a variety of constitutional grounds. Many courts have held the Guidelines

unconstitutional for denial of due process, including the *en banc* opinion of this District authored by the distinguished Senior Judge A. Andrew Hauk. *United States v. Ortega–Lopez*, 684 F.Supp. 1506 (C.D.Cal.1988) (*en banc* ). *See also, United States v. Alafriz*, 690 F.Supp. 1303 (S.D.N.Y.1988); *United States v. Scott*, 688 F.Supp. 1483 (D.N.M.1988); *United States v. Elliott*, 684 F.Supp. 1535 (D.Colo.1988).

In *Mistretta v. United States*, 488 U.S. ——, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), the Supreme Court held that the Guidelines were not unconstitutional on specific separation of powers grounds. The Court neither addressed nor resolved the due process question.

true that the Guidelines leave room for the exercise of unfettered judicial discretion. It is also true that the Guidelines mandate a structured mode of decision.

What is hidden, however, is that the range of sentencing discretion left to the sentencing judge is very narrow.[10] Before this range is even reached, the Guidelines establish vastly disparate yet *mandatory* periods of incarceration. These periods are based on factors which, for the most part, the sentencing judge is required to apply on the basis of any available information, whether or not that information was introduced at trial or proved beyond a reasonable doubt.[11]

The weight assigned to each factor determined to be applicable is the preassigned weight established by Congress through the Guidelines. These weights, however, may not be adjusted to reflect any relative uncertainty in the underlying facts. In-stead, the weighted factors found to apply are added mechanically, one on top of the other. The cumulation of these factors results in mandatory and substantial periods of incarceration that frequently bear *no relation* to the severity of the crime for which the defendant was convicted.[12] Indeed, the dominant portion of the sentence received by the defendant may be comprised of sentencing factors, and not the proven elements of the crime of conviction.

Invariably, these non-proven and highly individualized factors vary from defendant to defendant, even among those convicted of the same crime. The result is that through the Guidelines, Congress has *required* that different persons convicted of the *same* crime receive disparate sentences based upon facts not made elements of that crime or proved beyond a reasonable doubt.[13] In this court's view, Congress

**10.** The range in which unfettered discretion is permitted to operate will, in effect, offset a maximum of two total Offense Level Points, since the maximum sentence available under a specific point range is generally equivalent to the minimum sentence available under that point range plus two point levels. In this case, if the court accepts the facts determined by the probation office, no exercise of unfettered discretion could reduce Davis' sentence to less than 30 years.

**11.** The Guidelines provide no comprehensive method by which the sentencing judge may discriminate between the sources of information used in sentencing convicted defendants under the Guidelines. As a result, the sentencing judge must draw from a variety of "evidence" provided by various sources. Of course, the sentencing judge may consider evidence properly introduced to a jury at trial. The judge may also consider information in a defendant's Pre–Sentence Report provided by the probation office, which conflicts with evidence presented at trial, and information which is simply additive. Information may also be introduced by the defendant. Where it conflicts with information provided by the Government, an evidentiary hearing may be held, but the information considered is not required to meet any articulated standard of reliability.

While the foregoing is far from an exhaustive list of the information a sentencing judge may consider under the Guidelines, it is demonstrative of the ill-defined scope of inquiry within which sentencing determinations are to be made.

**12.** In the instant case, the court's determinations with respect to the amount of cocaine involved in the underlying transaction and Davis' Role in the Offense will account for the difference between 2½ and 30 years of incarceration (the difference between 18 and 42 Offense Level Points, assuming a Criminal History Category of II; 18 points reflects a finding of less than 25 grams of cocaine, while 42 points reflects a finding of more than 50 kilograms of cocaine). *See also* discussion at pp. 15–19.

For purposes of comparing sentences at varying offense levels, the court assumes that all the recommended enhancements would otherwise apply and that the minimum sentence within the required range would be imposed.

**13.** This disparity cannot be equated for purposes of due process with the disparity that arguably results from unfettered judicial discretion. The disparities in sentencing which are the product of unfettered discretion almost uniformly reflect the myriad of idiosyncratic circumstances posed by each defendant's sentencing. Due process is achieved by the individual judge's effort in each case to achieve justice in the overall. The Supreme Court has therefore been adamant in requiring that all relevant information pertaining to each defendant be considered by the appropriate sentencing authority. Since it had been "well-established" that a sentencing judge prior to the Guidelines was to be "accorded very wide discretion in determining an appropriate sentence," he or she "must be permitted to consider any and all information that reasonably might bear on the proper sentence for the particular defendant." *Wasman v. United States,* 468 U.S. 559, 563, 104 S.Ct. 3217, 3220, 82 L.Ed.2d 424 (1984).

cannot require such disparities without also requiring that the specific lengths of the sentences turn on facts determined at trial according to a common standard of proof based upon information meeting a common standard of reliability.[14]

## DUE PROCESS CONCERNS

In no area of law is a higher degree of certainty required than in the determination of the facts upon which an individual is to be deprived of personal liberty. The Due Process Clause commands that Congress may not require that any person be incarcerated for a fixed period directly attributable to a specific fact determination unless proved beyond a reasonable doubt.[15] *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970); *Mullaney v. Wilbur*, 421 U.S. 684, 704, 95 S.Ct. 1881, 1892, 44 L.Ed.2d 508 (1975); *see also McMillan v. Pennsylvania*, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986).

The Government has argued that a distinction is drawn when the issue is not *whether* one will be deprived of personal liberty, as in the determination of guilt or innocence, but rather for *how long* one will be deprived, as in sentencing. The Government points out that in fixing sentencing lengths, judges have always taken into account factors which were not elements of the crime, and as to which the relevant facts were not shown with any articulated degree of certainty.

**14.** Requiring that the Guidelines determinations be made on the basis of evidence (whether by a preponderance or otherwise) would not solve this dilemma. The sentencing judge must apply factors far too numerous and complex to be subject to such rigorous standards of proof. Indeed, requiring that the information relied upon by a sentencing judge meet *any* standard of proof raises the very real specter that the sentencing hearing could overwhelm the trial.

**15.** *See* Note 19, *infra.*

**16.** When Congress strips sentencing judges of any ability to equalize sentences to reflect differences in certainty of sentencing facts, the fact determinations are not procedural "sentencing determinations." They go instead to the substantive right to due process of law. *Compare Matthews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893,

The Government has not argued—nor could it—that judges have ever applied these factors with fixed weights applicable to all cases without adjustment to reflect differing degrees of certainty. By necessity, the exercise of discretion in sentencing requires the sentencing authority to weigh and balance various factors. *United States v. Wilkins*, 659 F.2d 769, 773 (7th Cir.1981), *cert. denied*, 454 U.S. 1102, 102 S.Ct. 681, 70 L.Ed.2d 646 (1981). It requires an equation between the cumulative weight of the factors deemed relevant for sentencing and the length of sentence imposed. Sentencing judges do not assign the same weight to facts deemed more likely than not on the basis of a poorly educated guess as they would to facts proved beyond a reasonable doubt. In the exercise of sentencing discretion, judges adjust the weights of the sentences to reflect the differences in the relative certainty of information on which the sentences are based.

Determinations of fact made by proof beyond a reasonable doubt and based upon evidence presented at a jury trial cannot be said to have the same weight as determinations deemed simply more likely than not on the basis of sparse or unreliable information. If Congress desires to fix specific sentencing lengths in advance of the commission of crimes, it must also fix the standard of proof.[16] For that purpose there is only one Constitutional standard: proof beyond a reasonable doubt. *Mullaney*, 421 U.S. at 698, 95 S.Ct. at 1889.[17]

47 L.Ed.2d 18 (1979) *with McMillan v. Pennsylvania*, 477 U.S. 79, 106 S.Ct. 2411.

**17.** In *Mullaney*, the Court confronted a Maine statute which shifted the burden of proof to the defendant to prove by a preponderance of the evidence that he had acted in the heat of passion in the killing of another. Since conviction for murder resulted automatically in life imprisonment, *Mullaney*, 421 U.S. at 686 n. 3, 95 S.Ct. at 1883, while conviction of manslaughter would result in a significantly lesser sentence, *id.* at 698, 95 S.Ct. at 1889, the Court struck down the statute and required that the state bear the burden of proving beyond a reasonable doubt the necessary mental state for murder.

Specifically, *Mullaney* held that the due process right to a standard of proof beyond a reasonable doubt extends to a determination of those factors that bear on the extent of punish-

This court has not found or been directed to any case which suggests that Congress may effect any other result. *McMillan v. Pennsylvania* does not go nearly so far.[18] *McMillan* provided that reduced standards of proof may be appropriate in sentencing when the fixed period of incarceration that follows from the application of a "yes or no" sentencing factor is proportionate to the sentence likely to follow from the underlying conviction. It did not sanction a lesser standard, however, where the portion of the sentence that follows from the application of the sentencing factor is the "tail that wags the dog of the substantive offense."[19] On the contrary, by distinguishing without overruling *Mullaney* and *Winship,* and acknowledging that there is no "bright line" between those two cases and it, *McMillan* lends support to the proposition that in the extreme case, when application of sentencing factors may over-whelm the sentence that would otherwise be imposed on the basis of proven elements, the statute cannot be constitutional. The Guidelines therefore fail to withstand constitutional scrutiny.[20]

## Case Analysis

The probation office has proposed that the Guideline range applicable to Davis is 360 months to life imprisonment. The Government has urged the court to sentence Davis to life.

Under the Guidelines, the specific offense for which Davis was convicted requires confinement for periods ranging from ten months to life imprisonment. Where the actual sentencing range will fall depends entirely upon factors to be determined in connection with sentencing. *None* of the factors that will determine whether Davis will be incarcerated for one

ment. In response to the argument raised by the State in *Mullaney,* and by the Government in the instant case, that once an initial level of guilt has been established, a defendant's "critical interests in liberty and reputation are no longer of paramount concern," *id.* at 697, 95 S.Ct. at 1889, the Court responded that the State "denigrates the interests found critical in *Winship,*" (holding that due process requires that *all* elements of a crime be proved beyond a reasonable doubt). *Id.* at 698, 95 S.Ct. at 1889. The *Mullaney* Court also dismissed the argument that the Maine statute affected only the extent of punishment and therefore avoided more rigorous due process demands, and warned that under such an analysis "[i]t would only be necessary to redefine the elements that constitute different crimes, characterizing them as factors that bear solely on the punishment" in order to avoid the effect of the *Winship* decision that requires proof beyond a reasonable doubt of each element. *Id.* at 697, 95 S.Ct. at 1889. *See also Adamson v. Ricketts,* 865 F.2d 1011 (9th Cir.1988), *petition for cert. filed,* 57 U.S.L.W. 3655 (U.S. Mar. 20, 1989) (No. 88–1553); *but see McMillan v. Pennsylvania* (state has discretion in determining what constitutes the elements of an offense).

18. In *McMillan,* the Court upheld a Pennsylvania statute that required the sentencing judge to determine whether a firearm had been used visibly in connection with certain major felonies. The determination, made on the basis of the preponderance of the evidence presented at trial or at post-trial hearing, triggered a mandatory five year minimum period of incarceration for the underlying offense.

The Court noted that the five year minimum triggered by the sentencing factor was at the low end of the range of penalties otherwise available for the crimes of conviction. The weight given to the firearm factor therefore could not be equated to any specific period of incarceration, nor risk overwhelming the sentence that followed from the underlying offense. *McMillan,* 477 U.S. at 88, 106 S.Ct. at 2418.

19. *McMillan,* 477 U.S. at 88, 106 S.Ct. at 2418. Under the Pennsylvania statute, the firearm determination is never specifically segregated from other elements of sentencing discretion for purposes of establishing a fixed or "add-on" sentence. On the contrary, the statute merely mandates that where this factor is deemed to co-exist with the charged elements of the major crimes to which it applies, the weight given to *all* of the sentencing factors to be considered shall not be less than five years in undifferentiated total.

20. This court also notes that under the Pennsylvania statute analyzed in *McMillan,* unlike many required Guideline factors, the firearm determination concerned a simple "yes or no" question. It did *not* involve matters of degree or relation and most of the relevant information likely came from direct testimony or demonstrative evidence. Although in this court's view, the preponderance standard of proof applied in *McMillan* would be inappropriate for the determination of a *fixed* period of incarceration, the fact that it was tied to evidence presumably introduced at trial provides a common and known standard of reliability and distinguishes a major defect of the Guidelines. *See* discussion at Note 11, *supra.*

year[21] or for the rest of his life were submitted to the jury or proved beyond a reasonable doubt. The information upon which many of the relevant facts must be determined is extremely sparse. Most of it comes solely from biased or otherwise unreliable sources.

### 1. Offense Conduct.

█ The probation office has assigned a base offense level of 36 to Davis' offense conduct. This assignment rests upon the conclusion that defendants intended to purchase more than 50 kilograms of cocaine. The offense level of 36 requires that Davis be incarcerated for a minimum of 17½ years, unless the Guidelines provide some separate basis for increasing or reducing the offense level, or for making a departure.[22]

Testimony of the Agent at trial indicated that the agreed-upon cocaine transaction was for the purchase of 100 kilograms at a price of $12,500 per kilogram.[23] In addition, the jury determined that the defendants brought more than $1,148,000 to the meeting place and that that amount should

be forfeited.[24] A transaction involving 50 kilograms or more calls for an offense level of 36 under the Guidelines.

Although the court believes that the information on which the probation office made its determination is adequate, this determination is nevertheless worthy of discussion. The amount of money brought to the scene by the defendants was insufficient to carry out the alleged bargain. Presumably to avoid this problem, the Government asked for and received a special instruction from the court that the amount of cocaine alleged in the Indictment was not an element of the charged crime and need not be established beyond a reasonable doubt.[25]

The Guidelines now require that the court determine whether more than 50 kilograms was involved in the transaction. If it makes such a determination, the court must impose precisely the same penalty as if the fact had been submitted to the jury and established beyond a reasonable doubt. The penalty may not be altered to reflect

21. Under the Guidelines, 12 months is the minimum sentence a defendant with a Criminal History Category of II can receive when convicted of a twelve point minimum offense level crime. A defendant with a Criminal History Category of I can receive a minimum of 10 months for conviction of the same crime.

22. Perhaps the most constitutionally offensive provision of the Guidelines is the Commentary to § 2D1.4. *Guidelines Manual,* § 2D1.4, at 2.49. It suggests that the sentencing judge should "approximate" the amount of drugs involved in offenses where "there is no drug seizure or the amount seized does not reflect the scale of the offense." *Id.* As a result, the difference between 10 months imprisonment and a life sentence can turn upon the accuracy of the court's assessment of the "scale of the offense," notwithstanding the lack of reliable information upon which to make that determination. Yet the Guidelines do not permit the judge to adjust the length of the sentence to reflect the degree of certainty by which the estimate is made. Almost no greater example of a sentencing factor in which the "tail wags the dog of the substantive offense" could be imagined. *See* Note 19 and accompanying text.

23. The record is in dispute with respect to the agreed upon price per kilogram. The Presentence Report states that defendants agreed to pay the price of $12,500 per kilogram, while the

First Superseding Indictment (the "Indictment") indicates that the established price was $1.2 million dollars for 100 kilograms, or $12,000 per kilogram.

24. Count One of the Indictment alleges, *inter alia,* that defendants "arrived at Hershel's Restaurant in Riverside, California in a light gray BMW sedan with four suitcases containing $1,148,410 in United States currency." All defendants were found guilty of Count One.

In Counts One and Two of the Indictment, the Grand Jury also alleged that certain property, "namely, $1,148,410 in United States currency and one (1) BMW four-door sedan" was subject to forfeiture pursuant to 21 U.S.C.A. § 853(a)(2) (West Supp.1989). All defendants, except defendant Ramirez, were convicted of Count Two as well as Count One.

25. Court's Instruction No. 29, modeled after a standard instruction routinely submitted by the Government in drug cases, reads:

In the indictment, it is alleged that a particular amount or quantity of cocaine was involved. The evidence in the case *need not establish that the amount or quantity of the cocaine was as alleged in the indictment,* but only that a measurable amount of cocaine was in fact the subject of the acts charged in the indictment. (Emphasis added.)

any concern held by the court for the degree of certainty.

The court has little doubt that the jury would have found beyond a reasonable doubt that more than 50 kilograms of cocaine were involved in the attempted purchase. But this is only by chance. The same determination would have been required if the Indictment had alleged no specific amount and the testimony had indicated that the agreed transaction involved the sale of only 50 kilograms at $12,500 per kilogram.

In such a case, if the defendants had arrived at the scene with only $600,000— enough to purchase only 48 kilograms at the agreed price—the court would have been required to select an explanation for the discrepancy in order to determine how much cocaine was involved in the transaction.[26] This determination could not reasonably be made on the basis of the information available. It certainly could not have been made beyond a reasonable doubt or by any other articulated standard of proof. It also could not have been avoided.

### 2. Role in the Offense.

The information upon which Davis' role in the offense must be assessed is even more problematic. The Guidelines provide

that the total offense level may be increased or decreased by as much as four points depending on this determination.

The probation office has recommended a four point increase, based upon its determination that Davis was an "organizer or leader" of the criminal activity.[27]

For the four point enhancement recommended by the probation office to be applicable, however, the "criminal activity" in which the defendant was a participant must involve at least five participants or be "otherwise extensive." The charged offense involved only four persons. The probation office recommendation therefore reflects *its* conclusion, unsupported by any substantial evidence introduced at trial, that Davis was an organizer or leader in an extensive criminal activity which goes considerably beyond the charged offense.[28]

The information relied upon by the probation office appears to have consisted entirely of statements attributed to the Agent.[29] These were to the effect that Davis admitted that the money brought to the scene was "his own" and that he was involved in extensive drug dealing in and around Oakland, California.

Such statements are demonstrably contrary to the consistent testimony offered in

**26.** The two offense levels which would rest upon this determination might seem relatively inconsequential until they are translated, as they must be, into three additional years of incarceration (the difference between 42 and 40 Offense Level Points under a Criminal History category of II).

Moreover, the amount of money brought to the scene could have been a lesser amount. If the amount had been only $60,000, it would have been sufficient to have purchased only 4.8 kilograms of cocaine at the agreed upon price, an amount which would have called for incarceration for 17½ years (the difference between 42 and 36 Offense Level Points under a Criminal History Category of II). The court sees no Guideline basis for making any estimate between these extremes or for ignoring the issue. At least 12½ years of Davis' life in prison under the Guidelines necessarily would follow from which way the court "jumped" to its conclusion.

**27.** Had the determination been that Davis was a "minimal participant" in the crime, the recommendation would have called for a four point reduction. 16 years of incarceration could turn on the court's determination of where in the spectrum between these two extremes Davis'

role in the offense falls (the difference between 42 and 34 Offense Level Points under a Criminal History category of II).

**28.** The Guidelines require the court to determine whether Davis served as an "organizer or leader" rather than a "manager or supervisor" with respect to the underlying offense. That section also requires the court to determine whether the activity was "otherwise extensive." *Guidelines Manual,* § 3B1.1, at 3.3. The court submits that drawing subtle distinctions between such illusory concepts cannot be done with any degree of certainty, and certainly cannot be done consistent with due process.

**29.** Although the Agent testified for several days, the statement made by the Agent that Davis admitted the money was his own was not given from the witness stand. Had the statement been made during testimony it would almost certainly have exposed the Agent to vigorous cross-examination. This might well have irreparably damaged his overall credibility, which in many respects was otherwise doubtful.

this court in other cases. Such testimony has suggested that it is highly unusual for major drug dealers to personally carry large amounts of money to the scene of out-of-town cocaine exchanges, particularly when dealing with strangers whom they have neither met nor done business with before. Indeed, on several occasions, expert testimony offered in this court by the Government has suggested that it is more usual for major dealers *not* to be present. Instead, the testimony has suggested that major drug dealers tend to employ others to carry the money to the meeting place in exchange for relatively small cuts or payments.

Testimony in other cases also has suggested that it is *not* usual for major drug dealers to have long and continuing arrest records for petty street crimes. Such an arrest record is more consistent with the pattern known to be associated with low level drug dealers who actually do their business in the streets and who might be available to serve as money carriers for others who are "leaders" or "organizers." [30]

In the court's view, the available information is inadequate to make a fair determination concerning Davis' role in the offense as required by the Guidelines. The question thus becomes how the court can rationally apply this factor in the instant case even when the relevant evidence shows little "indicia of reliability."

Some courts have suggested that the Guidelines factors should be applied according to a preponderance of the evidence standard.[31] The rationale underlying these decisions, however, is misleading. These courts suggest that the preponderance of the evidence standard is a known and accepted legal standard of proof and, therefore, may be considered fair and reliable. In fact, "preponderance of the evidence" has no consistent definition for Guideline purposes. It appears the standard is no more than that the relevant fact is deemed more likely true than not on the basis of the available information—no matter how limited or unreliable.[32] But, in this case, there is *no* reliable "evidence" upon which to apply the factors required by the Guidelines.[33]

3. Departures.

In response to the general due process concerns regarding the coercive nature of Guidelines sentences, the Government argues that by virtue of the means provided in the Guidelines for sentencing departures, the court "continues to be able to insure a just sentence." [34] While the Government acknowledges that sentences outside the applicable guideline range may be called for occasionally, it urges that "[n]othing prevents a court from imposing

---

**30.** Furthermore, no information supplied to the court indicates that Davis enjoyed the lifestyle associated with major drug dealing.

**31.** *United States v. Silverman,* 692 F.Supp. 788 (S.D. Ohio 1988); *United States v. Lee,* 818 F.2d 1052, 1057 (2d Cir.1987) *cert. denied,* —— U.S. ——, 108 S.Ct. 350, 98 L.Ed.2d 376 (1987) (relying on *McMillan v. Pennsylvania,* 477 U.S. 79, 106 S.Ct. 2411).

**32.** As the Government has noted, "the only constitutional barrier to a court in determining a sentence appears to be that action cannot be based upon "false or unreliable information"— that is, information "lacking some indicium of reliability beyond mere allegation." *Government's Brief,* p. 15 (citing *United States v. Ibarra,* 737 F.2d 825, 827 (9th Cir.1984)).

**33.** The presumed expertise of trial judges in evaluating the probity of information which does not accord with the rules of criminal evidence is of no avail. Even if there were information upon which to exercise such expertise, it would still be to no avail because the Guidelines make no provision for the court to give effect to its evaluations of probative matters.

The Government has suggested that where the court is not satisfied with the evidentiary basis for the determination of a particular factor, the solution is simply to find that the factor has not been established and not apply it at all. The court submits that, as to major factors which affect substantial periods of incarceration, when the matter is genuinely unclear, the all-or-nothing solution proposed by the Government produces more obvious and profound relative injustice than could be produced under the exercise of unfettered discretion, except in cases of clear abuse. In any event, the Government's proposal is wholly unsupported by the plain language of the relevant statutory authority.

**34.** *Government's Brief,* p. 20.

such a sentence; the only difference is that the reasons for the departure must be articulated and the parties can appeal." [35]

This statement reflects the view, apparently held by many, that if the Guidelines are upheld they will not prove overly pernicious. Simply stated, the view is that if the Guidelines produce what the trial judge sees as an unjust result, that judge should simply depart. In effect, this view suggests that, if the Guidelines are upheld, courts will rationalize away their mandatory nature by liberally interpreting the departure rules. It also assumes the difficult proposition that courts should and will simply ignore, in departure cases, the clear statutory intent of Congress in passing the Guidelines legislation.

The general departure provision is taken by the Guidelines directly from 18 U.S.C. § 3553(b).[36] It provides that the court may impose a sentence outside the Guideline range if it finds "that there exists an aggravating or mitigating circumstance of a kind or to a degree not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines." 18 U.S.C. § 3553(b).

The Sentencing Commission acknowledges that the circumstances which may warrant departure "by their very nature" cannot be listed and analyzed in advance. *Guidelines Manual*, § 5K2.0, at 5.36. It is clear, however, that the Sentencing Commission intended to leave the departure window open only a crack.[37] Section 5K2.0 is the only acknowledgment in the Guidelines that relevant sentencing factors may not have been adequately taken into account.

To the court's knowledge, the Guidelines do not contain any hint that a sentencing judge may refuse to consider or may alter the weight given to an identified guideline factor based upon the inadequacy of the information upon which the determination of that factor must be made. If that is the case, it is folly to suggest that the Guidelines do not prevent sentencing judges from insuring that their verdicts are just. It is equal folly to suggest that reasoned application of the departure rules can save the Guidelines from their basic unconstitutionality.

It is true, of course, that the pernicious effects of the Guidelines may be minimized if judges simply rationalize them away, and appeals courts permit them to do so. In fact, the long term effect of the Guidelines might well be reduced to the mere nuisance of requiring the production of writings purporting to reconcile decisions made subjectively with the objective mandates of the Guidelines.

In this court's view, this cannot be the law nor can it be defended by legal principle. Eliminating the unconstitutional effects of the Guidelines by rationalizing them away is not the answer. In any event, such a result would be a long time coming and inevitably incomplete. Over time, the Guidelines would alter the conduct of many judges in those cases where the resulting injustice does not seem too great, and of some judges even when the resulting injustice is disproportionate but the basis for changing it by departure is unclear. To this court, the effort made in the Guidelines to narrow the disparity resulting from the exercise of judicial discretion by identifying and quantifying the factors to be considered is therefore both self-contradicting and self-defeating.

CONCLUSION

The very nature of discretion is that it requires the exercise of judgment as to factors too numerous to identify, too interrelated to be considered separately and

---

**35.** *Government's Brief,* p. 21.

**36.** *Guidelines Manual* at 1.6.

**37.** "[I]t is clear there are some limits on the opportunity for departure. And it appears that the range of sentencing court discretion may be reduced even more in the future. As the introduction to the Guidelines Manual notes, '[b]y monitoring when courts depart from the Guidelines and by analyzing their stated reasons for doing so, the Commission, over time, will be able to create more accurate guidelines that specify precisely where departures should and should not be permitted.' [*Guidelines*] Manual at 1.7." *United States v. Vizcaino,* 870 F.2d 52, 54 (2d Cir.1989). *See also United States v. Nuno–Para,* 877 F.2d 1409 (9th Cir.1989).

too indefinite to be assigned specific weights. Any attempt to control the basic nature of discretion by quantification and separation of the factors to be considered and preassignment of the weights to be given is ultimately doomed to failure. The range within which discretion may operate can be narrowed, but its basic nature cannot be altered. The attempt to do so through the Sentencing Guidelines can only lead over time to greater and more obviously unjust disparity than already exists.

This is not to say that Congress can do nothing to guide or narrow the range of judicial sentencing discretion. Both of these objectives are legitimate and achievable. What is not legitimate is to require sentencing judges to make fact determinations according to unconstitutional standards, and then mandate application of these factors in ways which force sentencing judges to choose between their oaths of office and their consciences.

Based on the foregoing, and good cause appearing therefore,

IT IS HEREBY ORDERED that Defendant's Motion to Declare the Sentencing Reform Act of 1984 Unconstitutional is GRANTED.