960 F.2d 820
 UNITED STATES of America, Plaintiff-Appellee,
v.
Greg DAVIS, aka: Greg David, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Alfredo CHAVARIA-CASTENEDA, aka: Alfredo Chavaria
Casteneda, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Robert ACEVEDES-RAMIREZ, aka: Robert Aceves Ramirez, aka:
Robert Ramirez, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellant,
v.
Robert ACEVEDES-RAMIREZ, aka: Robert Aceves Ramirez, aka:
Robert Ramirez, Defendant-Appellee.
UNITED STATES of America, Plaintiff-Appellant,
v.
Moises NEGRON, Jr., Defendant-Appellee.
UNITED STATES of America, Plaintiff-Appellant,
v.
Greg DAVIS, Defendant-Appellee.
UNITED STATES of America, Plaintiff-Appellant,
v.
Alfredo CHAVARIA-CASTENEDA, aka: Alfredo Chavaria
Casteneda, Defendant-Appellee.
UNITED STATES of America, Plaintiff-Appellee,
v.
Greg DAVIS, aka: Greg David, Defendant-Appellant.
 Nos. 89-50335, 89-50337, 89-50345, 89-50359, 89-50360,
89-50361, 89-50364 and 90-50472.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 7, 1991.
Decided March 31, 1992.
 
 Karen Skrivseth, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee-appellant.
 David Z. Chesnoff, Goodman, Stein & Chesnoff, Las Vegas, Nev., for defendant-appellant-appellee Greg Davis.
 Earl Hanson, Hanson & Egers, Los Angeles, Cal., for defendant-appellant-appellee Robert Ramirez.
 Kevin F. Harrison, Fullerton, Cal., for defendant-appellant-appellee Alfredo Chavaria-Casteneda.
 Byron C. Thompson, Oakland, Cal., for defendant-appellee Negron.
 Appeal from the United States District Court for the Central District of California.
 Before: FARRIS, PREGERSON and THOMPSON, Circuit Judges.
 DAVID R. THOMPSON, Circuit Judge:
 
 
 1
 Appellants Greg Davis, Alfredo Chavaria-Casteneda (Casteneda), and Robert Acevedes-Ramirez (Ramirez) were convicted of conspiring to possess cocaine with the intent to distribute, and attempting to possess cocaine with the intent to distribute, both in violation of 21 U.S.C. § 846. Davis was also convicted of using a federal communication facility to facilitate the conspiracy in violation of 21 U.S.C. § 843(b).
 
 
 2
 The government's case against the appellants was based almost entirely on the testimony of two undercover agents. After their trial, the appellants learned that one of these agents, Marcario Duran, had been involved in a conspiracy to steal confiscated drug money from the Los Angeles County Sheriff's Department. Based on this discovery, they moved for a new trial under Fed.R.Crim.P. 33. The district court denied the motion.
 
 
 3
 In this appeal, the appellants argue: (1) despite the fact that the newly-discovered evidence would only be admissible to impeach the government witness, Duran, the district court erred in denying the motions for a new trial; (2) the evidence presented at their trial was insufficient to support their convictions; (3) their convictions cannot stand because the government never had any cocaine to sell them, and did not intend to sell them any cocaine; and (4) if the government succeeds in its cross-appeal, Sentencing Guideline 3E1.1 should be held unconstitutional because it forces a defendant to relinquish his right to assert his innocence on appeal. Davis also challenges his convictions on grounds of juror bias and prosecutorial misconduct.
 
 
 4
 The government cross-appeals from the district court's refusal to sentence the appellants (and their codefendant Moises Negron) under the Sentencing Guidelines. The district court held that the Sentencing Guidelines are unconstitutional.
 
 
 5
 We have jurisdiction under 28 U.S.C. § 1291. We affirm the district court's denial of the appellants' new trial motions and affirm their convictions. We reverse the district court's refusal to apply the Sentencing Guidelines. We hold that the Guidelines, including section 3E1.1, are constitutional, and remand to the district court for resentencing.
 
 FACTUAL BACKGROUND
 
 6
 Posing as a Chicago attorney with established drug connections, undercover Drug Enforcement Administration agent Abnecio Cordova arranged to meet with appellant Casteneda in order to negotiate a cocaine sale. At the time, Casteneda was acting as a middleman for a number of other California drug dealers. Cordova offered to supply Casteneda's clients with cocaine for $10,000 per kilogram. Casteneda agreed to this price and promised to arrange a meeting between Cordova and some Los Angeles buyers. The meeting was scheduled for May 18, 1988, at a restaurant in Riverside, California.
 
 
 7
 Cordova arrived at the restaurant for the meeting accompanied by Marcario Duran, a Deputy Sheriff with the Los Angeles County Sheriff's Department. Duran was also working undercover as a drug trafficker. Cordova and Duran were met by Casteneda and appellant Davis. Casteneda introduced Davis as "the guy who wants to buy the 100 kilos."
 
 
 8
 Davis expressed an interest in buying cocaine and assured Cordova that he was prepared to buy the drugs that day. When Davis refused to produce any money, however, Cordova threatened to call off the deal. Davis then agreed to telephone his associates and have the money delivered.
 
 
 9
 Duran accompanied Davis to the restaurant lobby where Davis placed a telephone call. Davis told the person who answered: "I'm here with the people. Everything is okay. Send the money out and bring the five with you." Davis then handed the receiver to Duran who provided directions to the restaurant. After this conversation, Davis assured Cordova and Duran that "his people" were on their way with the money. Davis later remarked that his associates would be arriving in a gray BMW. When he was asked whether the car would hold the entire cocaine shipment, Davis responded that it would not be a problem because "we've placed 110 kilograms in the trunk of the car several times."
 
 
 10
 Several hours later, appellants Ramirez and Moises Negron[1] arrived at the restaurant in a gray BMW. Casteneda introduced Ramirez and Negron to Cordova as "the persons who brought the money." When questioned about the delay, Ramirez explained that they were detained in traffic after they picked up "the stuff." At no time during this discussion did Davis ever ask who Ramirez and Negron were or why they were present. Instead, he simply inquired whether everything was all right, and then instructed Negron to bring the BMW around to a parking lot behind the restaurant.
 
 
 11
 Once the BMW arrived, the undercover officers and the appellants discussed the specifics of the narcotics transfer. They eventually agreed that Davis and Duran would go to the airport together to pick up the cocaine.[2] During this conversation, Duran specifically referred to the cocaine in the presence of all the appellants. Ramirez then returned to the restaurant, where he remained until he was arrested.
 
 
 12
 Once the details of the transfer were ironed out, Davis instructed Negron to open the BMW's trunk and assist Cordova in removing three suitcases. Cordova and Duran inspected two of the suitcases and found that both were filled with United States currency, primarily in small bills. It was later determined that the suitcases held more than $1 million in cash. After the money was unloaded, Davis took the BMW keys and started to leave for the airport. Before he could leave, however, he and the other appellants were arrested.
 
 
 13
 At trial, both Cordova and Duran testified extensively for the government. Davis and Casteneda did not testify and did not offer any evidence. Ramirez also refused to testify, but his sister testified in his defense that to the best of her knowledge Ramirez had never been involved in any drug-related activities. On October 25, 1988, the jury returned its guilty verdicts.
 
 
 14
 On February 22, 1990, some 16 months after the appellants' trial ended, Duran was indicted on charges of conspiring to steal confiscated drug money from the Los Angeles County Sheriff's Department, signing a false tax return, and illegally structuring a currency transaction to evade federal reporting requirements. Duran was convicted of the structured currency count on December 10, 1990. On February 6, 1991, a second indictment was filed, charging him with conspiring to obstruct justice, perjury, signing a false tax return, and making a false statement in a loan application. He is currently awaiting trial on these charges.
 
 
 15
 According to the government, neither it nor the Sheriff's Department learned of the conspiracy to steal confiscated drug money until the Department was tipped off by an anonymous letter on October 28, 1988, three days after the appellants were convicted. Duran was not implicated until several months later. The defendants discovered Duran's involvement after he was indicted on February 22, 1990. They filed their new trial motions on June 22, 1990. The court denied these motions and this appeal followed.
 
 
 16
 * APPELLATE JURISDICTION
 
 
 17
 As a preliminary matter, the government challenges our jurisdiction to review the district court's denial of Ramirez and Casteneda's new trial motions because, unlike Davis, neither of them filed a notice of appeal after the court denied their motions for a new trial. See Fed.R.App.P. 4(b). Both had filed earlier timely notices of appeal from their judgments of conviction.
 
 
 18
 Although we have never addressed the issue, at least two other circuit courts have held that a court of appeals has jurisdiction to review the denial of a post-trial motion under Fed.R.Crim.P. 33 based on newly-discovered evidence even though no second notice of appeal from the denial of that motion has been filed, provided an initial timely notice of appeal from the judgment of conviction has been filed and the government has not been prejudiced. United States v. Wilson, 894 F.2d 1245, 1251 (11th Cir.) ("[a] second notice of appeal is not required in order for [the appellants] to challenge the district court's denial of their motions for a new trial[,]" where no prejudice to the government results), cert. denied sub nom., Levine v. United States, --- U.S. ----, 110 S.Ct. 3284, 111 L.Ed.2d 792 (1990); United States v. Burns, 668 F.2d 855, 858 (5th Cir.1982) ("While it may be desirable for a second notice of appeal to be filed, we must conclude that there is no requirement in the law that this be done to perfect an appeal.").
 
 
 19
 Here, all appellants filed timely notices of appeal from their respective judgments of conviction and the government has failed to show any prejudice. While we recognize that the requirements of Rule 4(b) are "both mandatory and jurisdictional," United States v. Eccles, 850 F.2d 1357, 1363 (9th Cir.1988), the rule does not preclude appellate jurisdiction in this case. See Fed.R.App.P. 4(b). We conclude that we have jurisdiction to consider all of the appellants' challenges to the district court's denial of their motions for a new trial, notwithstanding that only appellant Davis filed a second notice of appeal from the court's denial of his new trial motion.
 
 II
 MERITS OF THE NEW TRIAL MOTIONS
 
 20
 In order for newly-discovered evidence to warrant a new trial, the appellants must show that(1) the evidence is newly discovered and was unknown to [them] at the time of trial, (2) the evidence is material, not merely cumulative or impeaching, (3) the evidence will probably produce an acquittal, and (4) failure to learn of the evidence sooner was not due to a lack of diligence.
 
 
 21
 United States v. Walgren, 885 F.2d 1417, 1428 (9th Cir.1989).
 
 
 22
 The newly-discovered evidence of Duran's illegal conduct would have been admissible to challenge his credibility as a witness. The government argues, however, that the discovery of this evidence cannot support a motion for new trial, because the evidence would only tend to impeach Duran, and impeachment evidence, according to the government, is never sufficient to warrant a new trial under Fed.R.Crim.P. 33.
 
 
 23
 There is language in a number of our decisions which, at first blush, lends support to this argument. We have held that when the effect of newly-discovered evidence is merely to impeach a witness, a new trial is unwarranted. See United States v. Kulczyk, 931 F.2d 542, 549 (9th Cir.1991) ("[E]vidence that would merely impeach a witness cannot support a motion for a new trial."); United States v. Alexander, 695 F.2d 398, 402 (9th Cir.1982) ("Evidence which is merely impeaching is not sufficient to support a motion for new trial."). Here, however, the appellants argue the newly-discovered evidence would do more than merely impeach Duran; it would render his testimony useless. According to the appellants, with Duran's testimony eliminated, the remaining evidence against them is insufficient to support their convictions.
 
 
 24
 The point the appellants make is illustrated by United States v. Taglia, 922 F.2d 413 (7th Cir.1991). In Taglia, the Seventh Circuit stated:
 
 
 25
 Nothing in the text or history of Rule 33, or of the cognate civil rule (Rule 60(b)), supports a categorical distinction between types of evidence; and we cannot see the sense of such a distinction. If the government's case rested entirely on the uncorroborated testimony of a single witness who was discovered after trial to be utterly unworthy of being believed because he had lied consistently in a string of previous cases, the district judge would have the power to grant a new trial in order to prevent an innocent person from being convicted. The "interest of justice," the operative term of Rule 33, would require no less...."
 
 
 26
 Id. at 415.
 
 
 27
 This reasoning is persuasive. Ordinarily, evidence impeaching a witness will not be material under Walgren because it will not refute an essential element of the government's case. See Walgren, 885 F.2d at 1428; cf. Lindsey v. United States, 368 F.2d 633, 637 (9th Cir.1966), cert. denied, 386 U.S. 1025, 87 S.Ct. 1383, 18 L.Ed.2d 465 (1967). At most, it will provide the trier of fact with a reason to find the witness' testimony incredible.
 
 
 28
 In some situations, however, the newly-discovered impeachment evidence may be so powerful that, if it were to be believed by the trier of fact, it could render the witness' testimony totally incredible. In such a case, if the witness' testimony were uncorroborated and provided the only evidence of an essential element of the government's case, the impeachment evidence would be "material" under Walgren. Moreover, Rule 33 permits the granting of a new trial motion "if required in the interest of justice." Fed.R.Crim.P. 33. If newly-discovered evidence establishes that a defendant in a narcotics case has been convicted solely on the uncorroborated testimony of a crooked cop involved in stealing drug money, the "interest of justice" would support a new trial under Rule 33.
 
 
 29
 We assume for purposes of the following discussion that the newly-discovered impeachment evidence of Duran's criminal activity is so powerful that a jury would find his testimony totally incredible. The question then becomes, was there sufficient evidence apart from Duran's testimony to permit a reasonable jury to find the appellants guilty beyond a reasonable doubt? We now consider this question.A. The Conspiracy Count
 
 
 30
 "The elements of [a] conspiracy are: (1) an agreement to accomplish an illegal objective, (2) coupled with one or more acts in furtherance of the illegal purpose, and (3) the requisite intent to commit the underlying substantive offense." United States v. Pemberton, 853 F.2d 730, 733 (9th Cir.1988).
 
 1. Davis
 
 31
 It is clear from Cordova's testimony that Davis agreed to accomplish an illegal objective. Not only did he agree to buy the 100 kilograms of cocaine, he also agreed to a specific price of $10,000 per kilogram. In fact, Davis suggested the means for transferring the cocaine and decided to accompany Duran to the airport to pick up the shipment.
 
 
 32
 Cordova's testimony also shows that Davis manifested a present intent to complete the sale. Davis repeatedly assured Cordova that he was ready to conclude the deal and that his associates were simply awaiting his instructions before delivering the money. When the money finally arrived, Davis turned it over to Cordova and prepared to leave for the airport to pick up the cocaine. There was sufficient evidence to convict Davis, without Duran's testimony.
 
 2. Ramirez
 
 33
 According to Cordova, Ramirez and Negron arrived at the restaurant a few hours after Davis remarked that his associates were en route. After being introduced by Casteneda, Ramirez immediately asked Cordova whether he was a police officer. After satisfying himself that Cordova was not an undercover officer, Ramirez stated that he and Negron had brought the money, and had parked their car behind the restaurant. Negron later retrieved the BMW and unloaded three suitcases filled with over $1 million.
 
 
 34
 Cordova also testified that Ramirez was present when he discussed the transaction with Casteneda and Davis. During this conversation, Casteneda stated that after the first deal was completed, everything would be okay. Davis also remarked that he wanted to change the site for future transactions and that he was sure the BMW could hold the entire cocaine shipment.
 
 
 35
 Duran's testimony differed from Cordova's in only one respect. According to Duran, Ramirez was present when Duran asked whether any of the appellants wanted to accompany him to the airport to pick up the cocaine. Cordova never mentioned this. Cordova's testimony, however, clearly shows that Ramirez was aware that the purpose of the conspiracy was to buy cocaine and that he was aiding the conspiracy by delivering the purchase money. This was sufficient to support his conviction. See, e.g., United States v. Taylor, 802 F.2d 1108, 1116 (9th Cir.1986), cert. denied, 479 U.S. 1094, 107 S.Ct. 1309, 94 L.Ed.2d 164 (1987) (evidence establishing beyond a reasonable doubt that a defendant had even a slight connection with an existing conspiracy is sufficient to establish knowing participation in the conspiracy).
 
 3. Casteneda
 
 36
 Cordova testified that he and Casteneda spoke on several occasions in order to arrange a meeting with Davis. During these conversations, Casteneda specifically agreed to a price of $10,000 per kilogram for any future cocaine transactions.
 
 
 37
 Casteneda not only arranged the meeting between Cordova and Davis, he also participated in it. Cordova testified that Casteneda introduced him to Davis, Ramirez, and Negron. Further, Casteneda discussed specifics of the cocaine transfer with Cordova and was present when the money was unloaded from the BMW. The evidence against Castenada was sufficient, without Duran's testimony, to support his conviction.
 
 
 38
 B. Attempt to Possess Cocaine with Intent to Distribute
 
 
 39
 The elements of attempt to possess cocaine with intent to distribute are: (1) an intent to engage in criminal conduct, coupled with (2) an overt act constituting a substantial step toward the commission of the crime. E.g., United States v. Arbelaez, 812 F.2d 530, 531 (9th Cir.1987).
 
 
 40
 As we have related, there was sufficient evidence, without Duran's testimony, to establish that the appellants intended to buy cocaine. It is also clear that each appellant committed at least one overt act in furtherance of the conspiracy. At this point, we need only determine whether these overt acts were "substantial step[s] towards commission of the crime." Id.
 
 
 41
 Cordova testified that Casteneda arranged the meeting with Davis and introduced the parties once they arrived at the restaurant. He also testified that Davis supplied the purchase money, and that Ramirez delivered this money to the restaurant. These were not simply preparatory acts. Each act was a substantial step taken by each appellant toward completing the cocaine deal. Given this evidence, a reasonable jury could have convicted the appellants of attempting to buy cocaine, even without Duran's testimony.
 
 C. Use of a Federal Communications Facility
 
 42
 Davis was separately convicted of using a federal communications facility to facilitate the drug conspiracy in violation of 21 U.S.C. § 843(b). In order to show a violation of section 843(b), "the government must establish knowing and intentional use of a communications facility, e.g., a telephone, to facilitate the commission of [a] narcotics offense." United States v. Phillips, 664 F.2d 971, 1032 (5th Cir.1981). "Use" of a federal communication facility for purposes of this section occurs when a defendant either personally uses a telephone or instructs someone else to use one. United States v. Reese, 775 F.2d 1066, 1075 (9th Cir.1985).
 
 
 43
 Although Duran's testimony provided the only direct evidence that Davis used a telephone, there was substantial circumstantial evidence from which the jury could have found beyond a reasonable doubt that Davis did in fact use a telephone, or instructed Duran to use a telephone, to facilitate the drug deal. According to Cordova, Davis said his associates were waiting for his telephone call before they delivered the money. When Davis eventually agreed to conclude the transaction, he said he would telephone his associates and arrange for the money to be delivered. Davis and Duran then went to the lobby of the restaurant to place the call. The only telephone available was in the restaurant's lobby. Several minutes later Cordova followed them to the lobby and saw Duran on the phone and Davis standing nearby. Davis said his associates were en route and were bringing the money in a gray BMW. Negron and Ramirez arrived shortly thereafter in a car that fit this description. The car contained over $1 million in cash.
 
 
 44
 A defendant may be convicted under section 843(b) based on circumstantial evidence. United States v. Linn, 880 F.2d 209, 215 (9th Cir.1989) ("call's contents can be proven by circumstantial evidence"); United States v. Adler, 862 F.2d 210, 215 (9th Cir.1988) (subsequent surveillance sufficient to show that phone call was received). In this case, the circumstantial evidence supports the conclusion that Davis either used a telephone, or instructed Duran to use one, in order to signal his associates to deliver the money.
 
 D. No Error in Denial of New Trial Motions
 
 45
 We conclude that even if the impeachment evidence completely destroyed Duran's testimony, there remains sufficient evidence to support all of the appellants' convictions. Thus, the appellants have not shown that the newly-discovered impeachment evidence "will probably produce an acquittal." See Walgren, 885 F.2d at 1428 (to support motion for new trial movant must show that newly-discovered evidence "will probably produce an acquittal"). Accordingly, the district court did not err in denying the appellants' motions for new trial.[3]III
 
 SUFFICIENCY OF THE EVIDENCE
 
 46
 We have analyzed the sufficiency of the evidence against all three appellants in reviewing the district court's order denying their motions for a new trial. We have found that without Duran's testimony there is sufficient evidence to support their convictions. It is unnecessary to repeat the same discussion here in response to Davis' and Ramirez's separate argument that the evidence is insufficient to support their convictions as to the conspiracy and attempt counts, and Davis' separate argument that the evidence is insufficient to support his conviction on the telephone count.
 
 IV
 GOVERNMENT'S INABILITY TO SUPPLY THE COCAINE
 
 47
 The appellants also contend that they were improperly indicted for, and ultimately convicted of, conspiring to possess cocaine. They argue that, because the government never had any cocaine to sell, it was legally impossible for the appellants to have committed the underlying offense of possession. We disagree. A criminal conspiracy may be established "regardless of whether the crime agreed upon is actually committed." United States v. Feola, 420 U.S. 671, 694, 95 S.Ct. 1255, 1268, 43 L.Ed.2d 541 (1975). The fact that the government had no cocaine to sell is irrelevant.
 
 
 48
 The appellants also challenge the sufficiency of their indictment by arguing that, because the government never intended to sell them any cocaine, they were actually convicted of "conspiring to attempt to possess and distribute cocaine," an offense which does not exist under the law. In support of this argument, the appellants rely on United States v. Meacham, 626 F.2d 503 (5th Cir.1980), cert. denied sub nom., United States v. Hayes, 459 U.S. 1040, 103 S.Ct. 455, 74 L.Ed.2d 608 (1982), in which two defendants were indicted for, and convicted of, " 'conspir[ing] to attempt' to violate 21 U.S.C. § 846." Id. at 507. There, the Fifth Circuit reversed the convictions, concluding that the crime of "conspiring to attempt" did not exist under section 846. Id.
 
 
 49
 The appellants' reliance on Meacham is misplaced. Here, the appellants were charged with two separate and distinct crimes under 21 U.S.C. § 846: (1) conspiring to possess cocaine with intent to distribute, and (2) attempting to possess cocaine with intent to distribute. Meacham is inapposite.
 
 V
 DAVIS' ADDITIONAL CHALLENGES
 
 50
 Davis challenges his convictions on two additional grounds. He argues that his sixth amendment right to an impartial jury was violated because one juror stated during a post-trial interview that, "[f]rom the first day I knew [Davis] was guilty." This argument is meritless. The juror's statement reflects his personal feelings and beliefs concerning Davis. The statement is insufficient to set aside a verdict. See Medina v. United States, 254 F.2d 228, 231 (9th Cir.), cert. denied, 358 U.S. 846, 79 S.Ct. 72, 3 L.Ed.2d 80 (1958); see also Fed.R.Evid. 606(b).
 
 
 51
 Davis also argues that the prosecutor impermissibly commented during closing argument on Davis' failure to testify. We reject this argument.
 
 
 52
 During closing argument the prosecutor asked the jury on two different occasions to consider what possible explanation existed for Davis' conduct, other than his desire to buy cocaine. Davis objected, arguing that by these statements the prosecutor improperly commented on his failure to testify. Although the trial judge disagreed, he nevertheless reminded the jury that the appellants had no obligation to present any evidence at trial. Davis now contends that this instruction was ineffective, and that the prosecutor's comments require a new trial.
 
 
 53
 A prosecutor may respond to a defendant's claims during closing argument, "so long as the comment is not manifestly intended to call attention to the defendant's failure to testify," and "the jury would [not] naturally and necessarily take it to be a comment on the failure to testify." United States v. Bagley, 772 F.2d 482, 494 (9th Cir.1985), cert. denied, 475 U.S. 1023, 106 S.Ct. 1215, 89 L.Ed.2d 326 (1986). Here, the prosecutor's remarks were not directed to Davis' failure to testify. Rather, they simply rebutted Davis' argument that the government had not proved he intended to buy cocaine.
 
 VI
 SENTENCING GUIDELINES
 
 54
 In its cross-appeal, the government challenges the district court's refusal to apply the Federal Sentencing Guidelines in determining the appellants' sentences. The appellants argue, and the district court agreed, that the Guidelines are unconstitutional because they preclude the sentencing judge from adjusting the weights of the various sentencing factors to reflect differences in the reliability of evidence. United States v. Davis, 715 F.Supp. 1473, 1483 (C.D.Cal.1989).
 
 
 55
 After the appellants were sentenced, this court rejected the same arguments the appellants raise in this appeal. United States v. O'Neal, 937 F.2d 1369, 1376 (9th Cir.1990); United States v. Rafferty, 911 F.2d 227, 231 (9th Cir.1990); United States v. Wilson, 900 F.2d 1350, 1354 (9th Cir.1990). The Guidelines must be applied in sentencing the appellants.
 
 
 56
 The appellants also challenge the constitutionality of Federal Sentencing Guideline § 3E1.1, which allows a defendant a two-point reduction in his adjusted offense level if he "clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct." They argue that this section is unconstitutional because compliance forces a defendant to relinquish his right to assert his innocence on appeal.
 
 
 57
 In United States v. Gonzalez, 897 F.2d 1018, 1021 (9th Cir.1990), we rejected the argument that section 3E1.1 violates a defendant's privilege against self-incrimination under the fifth amendment. We observed that the purpose of section 3E1.1 is to encourage defendants to accept responsibility for their actions during the early stages of prosecution. Id. The purpose is not to punish those who choose to exercise their constitutional rights. Id. We held that section 3E1.1 does not violate a defendant's fifth amendment privilege against self-incrimination despite the fact that if he chooses to remain silent he may not receive a two-point reduction in his sentence for acceptance of responsibility. Id.
 
 
 58
 Our rationale in Gonzalez is equally persuasive when applied to the argument that section 3E1.1 prohibits a meaningful opportunity for a defendant to assert his innocence on appeal. The crux of the appellants' argument is that section 3E1.1 is unconstitutional because it forces a defendant into a Hobson's choice: he must either admit his guilt and forego the opportunity to challenge a conviction on appeal, or he must plead not guilty, thus preserve his right to challenge his conviction on appeal, but in the process jeopardize his chance for a two-point reduction for acceptance of responsibility at the time of sentencing.
 
 
 59
 As we recognized in Gonzalez, the fact that section 3E1.1 forces a defendant to make a difficult choice does not infringe the defendant's constitutional rights. Id. See also United States v. Monsour, 893 F.2d 126, 129 (6th Cir.1990) (section 3E1.1 does not unconstitutionally impede a defendant's right to appeal); United States v. De Jongh, 937 F.2d 1, 5 (1st Cir.1991) (section 3E1.1 does not "unconstitutionally coerce[ ] [a defendant] into waiving her right not to self-incriminate herself and thus relinquish her right to assert her innocence on appeal"); United States v. Parker, 903 F.2d 91, 105 (2nd Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 196, 112 L.Ed.2d 158 (1990) ("We reject [the appellant's] argument that any requirement that he acknowledge personal responsibility in order to gain the benefit of the two-level reduction impermissibly prejudices his right to appeal his conviction."). We conclude that section 3E1.1 does not unconstitutionally impair a defendant's ability to challenge his conviction on appeal.
 
 VII
 CONCLUSION
 
 60
 We AFFIRM the appellants' convictions on all counts. We VACATE the appellants' sentences and REMAND for resentencing in accord with the Federal Sentencing Guidelines.
 
 
 
 [1]
 Moises Negron filed a notice of appeal from his conviction. He failed to take any further action, however, and his appeal was dismissed by order of this court on April 24, 1991. The government's cross-appeal of Negron's sentence remains before the court
 
 
 [2]
 In reality, neither of the officers had access to any cocaine, nor was there any plan to provide cocaine to the appellants once the money was exchanged
 
 
 [3]
 The appellants also contend that the prosecution improperly withheld the evidence of Duran's illegal conduct in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We reject this argument. In an ex parte affidavit filed in the district court in opposition to the new trial motions, the government established that the first time anyone connected with law enforcement, other than the culprits, learned of the scheme to steal confiscated drug money was when the Los Angeles Sheriff's Department received an anonymous letter three days after the appellants were convicted. Duran was not implicated in the scheme until several months later. Because the government did not know of Duran's misconduct prior to the appellants' convictions, it did not improperly suppress information pertaining to Duran's illegal conduct in violation of Brady