25 F.3d 1050
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Thomas Keith BATTLE, Defendant-Appellant.
 Nos. 92-6077, 93-6009.
 United States Court of Appeals, Sixth Circuit.
 May 19, 1994.
 
 Before: GUY and NELSON, Circuit Judges, and SPIEGEL, District Judge.*
 PER CURIAM.
 
 
 1
 These are consolidated appeals arising out of a two-count drug conviction. In his first appeal the defendant (1) contested the sufficiency of the evidence against him and (2) asserted error in the giving of a supplemental jury charge pursuant to Allen v. United States, 164 U.S. 492 (1896). After this appeal was argued, the defendant moved the district court for a new trial on the basis of evidence that the government's chief witness had become the subject of a federal drug investigation. We suspended consideration of the appeal pending a ruling by the district court on the motion for a new trial. The district court denied the motion, and the defendant appealed this ruling as well.
 
 
 2
 Upon consideration, we conclude that it was error to deny the motion for a new trial. The granting of a new trial moots the issues raised in the original appeal, so it will not be necessary for us to address them.
 
 
 3
 * Evidence presented at trial suggested that the following course of events occurred. Steven Mikels, director of Tennessee's Seventeenth Judicial District Drug Task Force, was engaged in undercover work during 1991. On Wednesday, May 22, 1991, Agent Mikels met with a man named Anthony Davis at a restaurant in the Hickory Hollow section of Nashville. Mr. Davis had been introduced to Agent Mikels as "a connection that could move a considerable amount of weight" of cocaine. Portraying himself as a drug supplier from Huntsville, Alabama, Agent Mikels inquired whether Mr. Davis would be interested in buying several kilograms of cocaine. Mr. Davis expressed interest in such a deal. Davis and Mikels exchanged telephone and pager numbers and agreed to meet again.
 
 
 4
 Mr. Davis paged Agent Mikels on Saturday, May 25, and when they subsequently spoke by telephone Davis invited the agent to meet with him and his partner, Belfrey Williams, at a Bennigan's restaurant. The three men had the meeting, discussed a schedule for delivering cocaine once an order had been placed, and agreed on a price of $22,000 per kilogram.
 
 
 5
 On Tuesday, May 28, another meeting took place at the same restaurant. This meeting was attended by Davis, Williams, Mikels, and two undercover police officers whom Agent Mikels represented to be his lieutenants in the drug trade. Agent Mikels reached agreement with Davis and Williams to a sale of eight kilograms of cocaine for $176,000. Davis and Williams insisted that they select the motel room where the transaction would take place, "since they had been taken--or in trouble before."
 
 
 6
 On the morning of Wednesday, May 29, Mr. Davis instructed Agent Mikels to meet him in Room 136 of a certain Best Western motel. Agent Mikels procured eight kilograms of cocaine from law enforcement sources, and surveillance teams went into the area around the motel. Agent Mikels met Williams and Davis in the designated room at 12:30 p.m. Mikels wore a body microphone through which the conversations in the room were recorded.
 
 
 7
 After they got to the motel room Davis and Williams disclosed to Agent Mikels that only about $110,000 had been raised, rather than the agreed $176,000. They also told Agent Mikels that their "money man" wanted to inspect the cocaine outside the motel room before making payment. The money man was nervous because he "just got out of prison, didn't want to get busted again and didn't want to meet nobody." (It was stipulated at trial that the defendant, Thomas Keith Battle, who was subsequently accused of having been the money man, had been paroled from the Tennessee prison system on January 15, 1991.)
 
 
 8
 Agent Mikels objected strenuously to parting with the cocaine before he had been paid for it. Mr. Williams then left the room "to meet the man" to discuss Mikels' objection. A law enforcement officer saw Williams depart and saw him make contact with defendant Battle, first at a game room adjacent to the motel and then at a service station across the street.
 
 
 9
 Mr. Williams returned to the room about thirty minutes after he had left. He reported that the money man still wanted to see the cocaine outside by himself before producing the money. Agent Mikels demurred, whereupon both Williams and Davis left the room "to go talk to the money man to negotiate terms." Two surveillance officers testified that they saw Williams and Davis leave the room about ten to fifteen minutes after Williams had come back the first time. They further testified that they saw Williams and Davis confer with defendant Battle at the service station, and that Battle then drove away from the station with Williams. One officer attempted to follow Battle's pickup truck, but lost it in traffic.
 
 
 10
 Mr. Davis returned to the motel room and proposed a compromise: Davis would check the authenticity and quality of the cocaine in the room, and would then call the money man. The money man would knock on the door, at which time Agent Mikels and his two assistants would go into a bathroom where they would not see the money man. Someone would hand the money to Agent Mikels in the bathroom. This compromise was acceptable to all.
 
 
 11
 One of Agent Mikels' associates brought the cocaine to the room. Mr. Davis checked the cocaine, found it acceptable, and placed a call in which he told the party at the other end that "the stuff was there and it was righteous." A surveillance officer observed Messrs. Battle and Williams turn into the entrance to the motel at 2:20 p.m. The expected knock on the door came a few moments later. Agent Mikels and his associates stepped into the bathroom, but kept the door slightly open so that they would have a view of the hallway when the motel room door was opened. Mr. Davis answered the door. Williams and Battle entered, the latter carrying a maroon bag. When he did not receive the money immediately, Agent Mikels called loudly for it from the bathroom. The maroon bag was handed into the bathroom. (A later count found that $129,780, mostly in twenty, ten, and five dollar bills, was stuffed in the bag.) Agent Mikels then gave the arrest signal to the officers outside. Defendant Battle and Messrs. Williams and Davis fled through a window in the back of the room, but they were apprehended outside.
 
 
 12
 A Tennessee federal grand jury returned a two-count indictment against Battle, Davis, and Williams on June 20, 1991. Count one alleged a conspiracy to distribute cocaine, and count two alleged possession of cocaine with intent to distribute it. Davis and Williams pleaded guilty to count one in return for the dismissal of count two and some sentencing concessions by the government. Mr. Battle pleaded not guilty to both charges and went to trial before a jury.
 
 
 13
 The jury returned a verdict of guilty--but only after it had told the court it was deadlocked, a circumstance that led the court to deliver an Allen charge. Mr. Battle was sentenced to a term of imprisonment for 160 months. A timely appeal followed.
 
 
 14
 After oral argument of the appeal, the defendant moved for a new trial under Rule 33, Fed.R.Crim.P. The motion was based on evidence that subsequent to the conviction Agent Mikels had become the subject of a federal corruption investigation; he was suspected of having sold illegal drugs outside the scope of his duties as a police officer. The alleged freelancing was said to have occurred in the Nashville area at around the time of the defendant's arrest. There is no evidence that Agent Mikels altered or falsified any of the information presented at Mr. Battle's trial, but we are given to understand that Agent Mikels has pleaded guilty to charges arising out of the corruption investigation.
 
 
 15
 We postponed consideration and decision of the appeal pending the district court's ruling on the motion for a new trial.
 
 
 16
 The district court ultimately denied the motion, the defendant filed a timely appeal, and the appeals have been consolidated. See United States v. Blanton, 697 F.2d 146 (6th Cir.1983).
 
 II
 
 17
 To prevail on a motion for a new trial on the basis of newly discovered evidence, the defendant must show that:
 
 
 18
 "(1) the new evidence was discovered after the trial;
 
 
 19
 (2) the evidence could not have been discovered earlier with due diligence;
 
 
 20
 (3) the evidence is material and not merely cumulative or impeaching; and
 
 
 21
 (4) the evidence would likely produce an acquittal." United States v. Hawkins, 969 F.2d 169, 175 (6th Cir.1992), cert. denied, 113 S.Ct. 1021 (1993).
 
 
 22
 It is undisputed that Mr. Battle has satisfied the first two elements of the Hawkins test. The question for this court is whether the district court abused its discretion in ruling against the defendant on the third and fourth elements.
 
 
 23
 As the district court correctly noted, this court has held that newly discovered evidence that would merely impeach the government's primary witness is not enough to require a new trial. United States v. Allen, 748 F.2d 334, 337 (6th Cir.1984) (citing United States v. Garner, 529 F.2d 962 (6th Cir.), cert. denied, 429 U.S. 850 (1976)). In the recent case of United States v. Davis, 15 F.3d 526 (6th Cir.1994), a defendant asserted that he was entitled to a new trial after it was discovered that one of the police officers who testified against him had resigned from the police force when faced with charges that he had planted evidence on a criminal suspect. We held that the defendant was not entitled to a new trial because the government's case had not been wholly dependent on that officer's testimony. Two independent witnesses were able to verify the corrupt officer's account of the events surrounding his arrest, and their testimony negated any conclusion that the cocaine found on the defendant had been planted on him.
 
 
 24
 We think this case is distinguishable from Davis. Agent Mikels' evidence was pivotal here, and the testimony of the officer in Davis was not.
 
 
 25
 We are guided in our decision by another Davis case, United States v. Davis, 960 F.2d 820 (9th Cir.), cert. denied, 113 S.Ct. 210 (1992), where the defendants had been convicted, in part, on the testimony of a crooked cop who was later charged with conspiracy to steal confiscated drug money, signing a false tax return, and illegally structuring a transaction in order to avoid federal reporting requirements. The Davis court acknowledged that ordinarily impeachment evidence will not be so material as to refute an essential element of the government's case, id. at 825, but went on to hold that
 
 
 26
 "In some situations, however, the newly-discovered impeachment evidence may be so powerful that, if it were to be believed by the trier of fact, it could render the witness' testimony totally incredible. In such a case, if the witness' testimony were uncorroborated and provided the only evidence of an essential element of the government's case, the impeachment evidence would be 'material'...." Id.
 
 
 27
 Since no trial witnesses corroborated Agent Mikels' account of the events in the hotel room, and since Agent Mikels' testimony alone established certain elements of the offense with which Mr. Battle was charged, we think the impeachment evidence in this case is "material."
 
 
 28
 We also think it relevant that the jury expressed difficulty in reaching a verdict here. Mr. Battle presented a "scapegoat" defense that was corroborated by several witnesses and that may have struck the jury as fairly persuasive. Mr. Battle claimed that he had been induced to drive Mr. Williams to the "real" money man on the representation that he would be picking up clothes for a girlfriend. (The officer who attempted to follow Mr. Battle's car lost sight of it and thus could not disprove Mr. Battle's version of the events.) At trial, Williams and Davis testified that Mr. Battle played no role in the drug deal and was present only because the real money man had suggested that Williams have a scapegoat present in case the police were involved in the deal. According to Williams, Thomas Battle was an innocent party whose only role was to drive Williams to an apartment where the drug money was provided by the real money man. Thus Davis and Williams' taped references to the "money man" from whom he would have to obtain approval of the deal and the observation of Davis and Williams talking to Mr. Battle are not necessarily inconsistent with the defendant's scapegoat defense.[1]
 
 
 29
 Mr. Battle also calls our attention to testimony presented by one Otis Singleton, whose story indicates that Davis and Williams were looking for a scapegoat. According to Mr. Singleton, Belfrey Williams had asked him for a ride that day, but he (Mr. Singleton) was unable to oblige. Mr. Singleton he surmised that he would have been in the defendant's seat had he granted Mr. Williams the favor of a ride. Mr. Battle told a similar story about Mr. Williams asking him for a ride.
 
 
 30
 Viewing the record as a whole, we are persuaded that the district court abused its discretion in denying the motion for a new trial. Accordingly, we VACATE the conviction and REMAND the case to the district court for a new trial.
 
 
 
 *
 The Honorable S. Arthur Spiegel, United States District Judge for the Southern District of Ohio, sitting by designation
 
 
 [1]
 Testimony from an interrogating officer suggested that both Williams and Davis remembered Mr. Battle's role differently just after they had been arrested, each indicating that they had contacted Mr. Battle to get the money for the transaction; this inconsistency arguably corroborates Mr. Battle's scapegoat theory, however