MAX N. TOBIAS, JR., Judge.
|, The defendant, Harry Fields, was charged with possession of cocaine with the intent to distribute and found guilty of the lesser included offense of possession of cocaine. Finding no patent errors or merit to any of his assignments of error, we affirm his conviction and sentence.
I.
Mr. Fields was charged by bill of information on 10 August 2011 with possession of cocaine with intent to distribute, a violation of La. R.S. 40:967 A. He entered a plea of not guilty at. his 22 August 2011 arraignment. The trial court denied his motion to suppress the evidence on 4 October 2011. Mr. Fields was tried by a twelve-person jury on 15-16 October 2012 and found guilty of possession of cocaine. The trial court denied Mr. Fields’ motion *760 for new trial on 7 May 2013 and, after defense counsel waived delays and announced the defendant’s readiness for sentencing, the court sentenced him to three years at hard labor and fined him $5,000.00. Mr. Fields was adjudicated a third-felony habitual offender |2on 31 July 2013 based upon a multiple bill of information, whereupon the trial court vacated his original sentence and resentenced him to four years at hard labor. The trial court denied Mr. Fields’ motion for reconsideration of sentence that same date and granted his motion for appeal.
II.
Former New Orleans Police Department (“NOPD”) Officer Demetrius Jackson testified that he was a NOPD narcotics officer on 5 August 2011. Officer Jackson stated that on that date he participated in an operation with Officers Damond Harris and David Barnes: surveillance at approximately 10:00 a.m. in the 2200 block of North Galvez Street, off Elysian Fields Avenue, in New Orleans. He confirmed that the area was known for drug activity, and that he previously had conducted narcotics investigations in that area. Approximately three minutes into the surveillance, he observed the defendant go into his sock, remove an object from it, and begin to display that object to females walking by and passing by in vehicles. Officer Jackson observed the defendant do this approximately four or five times, with no takers. He believed the defendant was soliciting to sell crack cocaine, and he notified Officers Harris and Barnes to stop the defendant. Officer Jackson identified Mr. Fields in court as the individual that he observed that day. Officer Jackson confirmed that after the defendant’s arrest, Officer Harris gave him a piece of crack cocaine allegedly recovered from the defendant. Officer Jackson placed that item on the books in NOPD Central Evidence and Property.
Officer Jackson identified State Exhibit 1 as the first page of the police report written by him in the case, under item number H-07175-11. He also identified State Exhibits 2 and 3, respectively, as the Central Evidence and Property receipt under that item number and one rock of crack cocaine weighing [¡¡.98 grams (which he opined was a lot of crack for one person to consume) given to him by Officer Harris.
On cross examination, Officer Jackson testified that Defense Exhibit 1 appeared to be a photograph of North Galvez Street, right off Elysian Fields Avenue, where the incident occurred. He confirmed that he never saw the defendant selling any drugs and never actually saw any drugs. He further testified that he could tell the object in the defendant’s hand was white, and that, based on his experience, he believed it to be crack cocaine. Officer Jackson testified that his car windows were up and that he could not hear anything Mr. Fields said to anyone. However, he said he could hear the defendant if he whistled or tried to flag down someone, and he observed people stop as the defendant was saying something.
Officer Jackson did not see Mr. Fields taken into custody. He was driving off as the other two officers were pulling up. He admitted that he never saw Mr. Fields put the white object back into his sock, his pocket, or anywhere. He never saw the defendant throw it or put it in his mouth/swallow it. Nor did he see the defendant make any furtive movements. The officer confirmed that he did not put into his report that defendant tried to run at any point. Officer Jackson did not put in any of his reports that another man was at “the location” because no one was there while he was there. However, Officer *761 Jackson admitted that he did mention while testifying at a motion hearing that another male was on the scene. Officer Jackson replied in the negative when asked whether he had ever told Officer Barnes or Officer Harris that he saw a bulge on Mr. Fields or believed that the defendant had a weapon.
|40n redirect examination, Officer Jackson stated that he did not see the second individual until he was pulling off and he did not see that second individual selling drugs, offering to sell drugs, or in fact doing anything. He confirmed that he did not see Mr. Fields take any money or sell any drugs.
Officer Damond Harris testified that on 5 August 2011, he and Officer Barnes were acting as the “take-down unit” for Officer Jackson, who was conducting the actual surveillance. They were parked in a vehicle on Elysian Fields Avenue. The officer testified that Officer Jackson alerted him about the defendant’s activities and described the defendant by the clothing he was wearing. He and Officer Barnes drove up Elysian Fields Avenue and turned onto North Galvez Street, where they observed the individual described by Officer Jackson in front of a residence. The individual observed that they were police officers and walked onto the porch. Officer Harris stated that as they were pulling up, another individual rode up on a bicycle and walked to the left side of the double residence at that location.
The two officers approached, and Officer Barnes communicated with the individual who had come up on the bicycle, who was eventually permitted to go free. Officer Harris informed the defendant why he was being stopped, conducted a pat-down of the defendant’s chest, waist area, pockets, and legs for weapons or contraband. He detected a “large lump” in the right side of one of the defendant’s socks, at which time he advised Mr. Fields of his Miranda rights. He removed the object from the defendant’s sock, finding it to be, based on his fifteen years of experience as a police officer, a rock of crack cocaine. Mr. Fields was then handcuffed. The defendant neither resisted arrest, nor made any statements. The officer stated that he gave the confiscated cocaine to Officer Jackson, who entered |fiit on the books at Central Evidence and Property. Officer Harris identified Mr. Fields in court as the person he and Officer Barnes arrested.
Officer Harris admitted that he had not been advised prior to stopping the defendant that defendant was possibly carrying a weapon. The officer testified that he did not feel a weapon when he patted Mr. Fields down and did not observe him discard one. He acknowledged that Mr. Fields was on the sidewalk when they pulled up in their car. The individual oh the bicycle had alighted, climbed up the stairs on the left side of the residence, and knocked on the door. Officer Jackson informed him that this individual had been riding up on his bicycle as they were en route to stop the defendant, so that individual was not patted down; he was not asked for his identification and his name was not checked. Officer Harris confirmed that he personally did not observe the defendant doing anything illegal, admitting that he was relayed information that the defendant had placed the white object back into his right sock.[1]
Officer Barnes’ testimony essentially tracked that of Officer Harris. He identified Mr. Fields as the person he and Offi *762 cer Harris arrested. He confirmed that he stopped the individual who rode up on the bicycle and did not get the individual’s name or any identification from him; neither did he check the person to see if he was in possession of any drugs before telling him he could leave.
NOPD Crime Lab Criminalist Corey Hall was qualified by the court as an expert in the field of chemical analysis of narcotics. Mr. Hall tested the rock of Ificocaine introduced in evidence in the present case and found it to be positive for cocaine.
Harold Peters, testifying for the defense, admitted to prior convictions for possession of cocaine and heroin in 2001. He had been friends with Mr. Fields since he dated the defendant’s sister some thirteen or fourteen years earlier. Mr. Peters remembered the day that the defendant was arrested. Mr. Peters said that he and his stepson were exiting a store with soft drinks at Elysian Fields Avenue and North Galvez Street, when they encountered the defendant standing in front of a residence on North Galvez. Mr. Peters stated that he and his stepson sat down on the steps, and Mr. Peters talked with Mr. Fields for ten to fifteen minutes.
Mr. Peters testified that a white police car pulled up; two officers jumped out, and one went to him, the other to Mr. Fields. He described one officer as a tall black male and the other as a shorter white male. The officers did not ask him for any identification. When asked whether he provided his name to them, Mr. Peters said he did not get a chance to say too much because the officer told him to get the “F” from around there. Mr. Peters said that during the time he was talking with the defendant, he was exchanging contacts from one cell phone to another. He replied in the negative when asked whether defendant was waiving drugs around or stopping people and asking them to purchase drugs. He also replied in the negative when asked whether the defendant was using drugs or whether he had seen the defendant with drugs that day. Mr. Peters further replied in the negative when asked whether he was on a bicycle that day or whether another male showed up on a bicycle.
On cross examination, Mr. Peters stated that the events occurred before noon. When asked which officer questioned him, the defendant first stated that he |7was uncertain, but thought it was the shorter officer. Mr. Peters stated that he would not lie for Mr. Fields. He did not see the defendant get placed in handcuffs or searched because he had walked off after being ordered to do so by the officer. However, he did say that before he had gotten a block away, Mr. Fields was gone in the police car.
HI.
A review of the record reveals no patent errors.
IV.
A.
In his first assignment of error, Mr. Fields argues that the trial court erred in denying his motion to suppress the evidence.
La.C.Cr.P. art. 703 A provides that “[a] defendant adversely affected may move to suppress any evidence from use at the trial on the merits on the ground that it was unconstitutionally obtained.” It is undisputed that the evidence in this case, the rock of crack cocaine, was seized by police from Mr. Fields without a warrant. Thus, at the motion to suppress hearing, the burden was on the state to prove the admissibility of that evidence. La.C.Cr.P. *763 art. 703 D; State v. Thompson, 11-0915, p. 13 (La.5/8/12), 93 So.3d 553, 563.
A trial court’s findings of fact, based on the weight of the testimony and the credibility of the witnesses at the motion to suppress hearing, may not be disturbed “unless there is no evidence to support those findings.” Id., pp. 13-14, 93 So.3d at 563, quoting State v. Wells, 08-2262, p. 4 (La.7/6/10), 45 So.3d 577, 580. Legal findings or conclusions of the trial court relative to the motion to suppress are reviewed de novo. Id., p. 14, 93 So.3d at 563, citing State v. Hunt, 09-1589, p. 6 (La.12/1/09), 25 So.3d 746, 751. An appellate court may review the testimony J^adduced at trial, in addition to the testimony adduced at a suppression hearing, in determining the correctness of the trial court’s pre-trial ruling on a motion to suppress. State v. Leger, 05-0011, p. 10 (La.7/10/06), 936 So.2d 108, 122; State v. Jefferson, 13-0703 through 0707, p. 3 (La.App. 4 Cir. 4/16/14), 140 So.3d 235, 239-240.
The Louisiana Supreme Court has recognized three tiers of police-citizen interaction. In the first tier, police may approach a citizen in a public place and ask him if he is willing to answer some questions, or put questions to him if he is willing to listen; as long as that person remains free to disregard the encounter and walk away, there are no constitutional implications. State v. Hamilton, 09-2205, p. 4 (La.5/11/10), 36 So.3d 209, 212-213. In the second tier, police can stop an individual if they have an objectively reasonable suspicion, supported by specific and articulable facts, that the person is committing, has committed, or is about to commit a crime. Id., p. 4, 36 So.3d at 212. In the third tier, police may arrest an individual if they have probable cause to believe that the individual has committed a crime. Id.
In the present case, Officer Jackson was the sole witness to testify at the 4 October 2011 hearing on defendant’s motion to suppress. Officer Jackson testified at that hearing that he received information from a confidential informant that a black male dressed in a gray shirt, black pants, with a towel on his head, was selling crack cocaine from in front of 2221 North Galvez Street. Officer Jackson confirmed that this informant was someone who had previously provided him with information leading to an arrest. Officer Jackson immediately drove to the location and positioned himself such that he had a clear view of the entire block. He observed a subject fitting the description given by the informant and, during his 19surveillance he observed the individual, later determined to be the defendant, reach into his sock and try to stop passersby, flagging them down. Officer Jackson said that each time the defendant attempted to stop people, they would shake their heads in a manner such as to convey “no.” Officer Jackson said he believed the defendant was attempting to sell narcotics, so he advised Officers Harris and Barnes to stop the defendant and conduct an investigation. The two officers stopped the defendant in front of the residence; one of them conducted a pat-down search for their safety, and immediately felt a hard rock object in the defendant’s right sock. One of the officers advised the defendant of his rights, arrested him, then removed the item from the sock, which a preliminary field test revealed was cocaine.
Officer Jackson testified on cross examination at the hearing that he remained in his surveillance position until the other two officers pulled up. He drove off as they arrived. He said one other individual was present when the two other officers pulled up. Officer Jackson did not see the defendant on the porch during the time he was at the scene. He replied in the negative *764 when asked whether he ever saw the defendant sell ■ anything, saying that he observed what he believed to be attempts by the defendant to sell. Officer Jackson did not see the defendant do anything with the object he had in his hand; he did not see the defendant place it back into his sock; he did not know what happened to the object that had been in the defendant’s hand. He testified on redirect examination that he believed $106.00 in currency was found on the defendant’s person.
Officer Jackson testified at trial that he had set up hundreds of surveillances and had conducted hundreds of drug investigations. He also confirmed at trial that he previously had conducted narcotics investigations in the same vicinity, which Imwas known for drug activity. He stated that during his surveillance of the defendant attempting to flag down passersby, he could tell that the object in the defendant’s hand was white. He stated that, based on his experience, he believed the object to be crack cocaine. Officer Jackson testified that he observed people stop as the defendant was saying things.
Officer Harris confirmed that he did not observe the defendant doing anything illegal. He testified that he and Officer Barnes made the investigatory stop of the defendant based solely on the information relayed to him by Officer Jackson. Officer Harris informed the defendant why he was being stopped; he conducted a pat-down for any weapons or contraband, patting down Mr. Fields’ chest, waist area, and pockets, all the way down to his' legs. Officer Harris said he detected a “large lump” in the right side of one of the defendant’s socks, at which time he advised the defendant of his Miranda rights. He removed ■ the object from the defendant’s sock, finding it to be, based on his fifteen years of experience as a police officer, a rock of crack cocaine. The defendant was then handcuffed.
This court set forth the applicable law on reasonable suspicion necessary to justify an investigatory stop in State v. Brown, 09-0722, pp. 8-9 (La.App. 4 Cir. 2/10/10), 32 So.3d 939,945-946, as follows:
La.C.Cr.P. art. 215.1 A codifies the U.S. Supreme Court’s authorization of stops based on reasonable suspicion set forth in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889(1968), and provides:
A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions.
| ^“Reasonable suspicion” to stop is something less than the probable cause required for an arrest, and a reviewing court must look to the facts and circumstances of each case to determine whether the detaining officer had sufficient facts within his knowledge to justify an infringement of the suspect’s rights. State v. Jones, 99-0861, p. 10 (La.App. 4 Cir. 6/21/00), 769 So.2d 28, 36-37; State v. Littles, 98-2517, p. 3 (La.App. 4 Cir. 9/15/99), 742 So.2d 735, 737. Evidence derived from an unreasonable stop, i.e., seizure, will be excluded from trial. State v. Benjamin, 97-3065, p. 3 (La.12/1/98), 722 So.2d 988, 989; State v. Tyler, 98-1667, p. 4 (La.App. 4 Cir. 11/24/99), 749 So.2d 767, 770. In assessing the reasonableness of an investigatory stop, the court must balance the need for the stop against the invasion of privacy that it entails. State v. Carter, 99-0779, p. 6 (La.App. 4 Cir. 11/15/00), 773 So.2d 268, 274.
The totality of the circumstances must be considered in determining whether *765 reasonable suspicion exists. State v. Oliver, 99-1585, p. 4 (La.App. 4 Cir. 9/22/99), 752 So.2d 911, 914. The detaining officers must have knowledge of specific, articulable facts, which, if taken together with rational inferences from those facts, reasonably warrant the stop. State v. Dennis, 98-1016, p. 5 (La.App. 4 Cir. 9/22/99), 758 So.2d 296, 299. In reviewing the totality of the circumstances, the officer’s past experience, training, and common sense may be considered in determining if his inferences from the facts at hand were reasonable. State v. Hall, 99-2887, p. 4 (La.App. 4 Cir. 10/4/00), 775 So.2d 52, 57; State v. Cook, 99-0091, p. 6 (La.App. 4 Cir. 5/5/99), 738 So.2d 1227, 1231. Deference should be given to the experience of the officers who were present at the time of the incident. State v. Ratliff, 98-0094, p. 3 (La.App. 4 Cir. 5/19/99), 737 So.2d 252, 254.
An informant’s tip may provide reasonable cause for a Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), investigatory stop, depending on the circumstances. State v. Howard, 12-1117, p. 10 (La.App. 4 Cir. 7/3/13), 120 So.3d 831, 838. In Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the U.S. Supreme Court found that a police officer had reasonable suspicion to make an investigatory stop of a person seated in a nearby parked car, based solely on the fact that the officer had just received a tip from a known reliable informant that the person was carrying narcotics, as well as a gun in his waistband. The Court distinguished the case from one involving an | ^anonymous informant, noting that the informant, who had given the tip in person, may well have been subject to arrest for making a false complaint had the investigation proved the tip unfounded.
La.C.Cr.P. art. 215.1 A provides for an investigatory stop based on reasonable suspicion. La.C.Cr.P. art 215.1 B states:
When a law enforcement officer has stopped a person for questioning pursuant to this Article and reasonably suspects that he is in danger, he may frisk the outer clothing of such person for a dangerous weapon. If the law enforcement officer reasonably suspects the person possesses a dangerous weapon, he may search the person.
In State v. Jones, 99-0861, p. 14 (La.App. 4 Cir. 6/21/00), 769 So.2d 28, 39, we explained that in order to justify a frisk of a suspect for weapons following an investigatory stop, a police officer does not need to be absolutely certain that the suspect is armed, but the facts must justify a belief that the officer’s safety or that of others is in danger, citing State v. Williams, 98-3059, p. 4 (La.App. 4 Cir. 3/3/99), 729 So.2d 142, 144. The pertinent question is not whether the officer subjectively believes he is in danger, or even whether he articulates a subjective belief during his testimony, but rather it involves the objective test of whether a reasonably prudent man in like the circumstances would be warranted in the belief that his safety or that of others was in danger. See State v. Dumas, 00-0862, pp. 2-3 (La.5/4/01), 786 So.2d 80, 81-82.
However, a recognized and close association exists between narcotics traffickers and weapons. State v. Wilson, 00-0178, p. 3 (La.12/3/00), 775 So.2d 1051, 1053. Thus, in Wilson, the Court upheld an officer’s protective frisk of an individual whom the experienced former undercover narcotics officer observed in a known drug area, crouched down next to the driver’s side door of an occupied 1vehicle, who got up at the sight of the officer turning onto the block and walked away, putting his hands into his jacket. Based primarily on the *766 recognized drug-trade/weapons connection, the court found that the officer had “a[n] articulable and objectively reasonable basis for conducting a self-protective search of the defendant’s outer clothing for weapons.” Id. In Jones, supra, this court, in reviewing the propriety of a weapons frisk, noted:
[I]n many instances, suspicion of drug dealing itself is an articulable fact that may support a frisk pursuant to La. C.Cr.P. art. 215[.1](B). State v. Fortier, 99-0244 (La.App. 4 Cir. 1/26/00), 756 So.2d 455 (“We can take notice that drug traffickers and users have a violent lifestyle, which is exhibited by the criminal element who are generally armed due to the nature of their illicit business. Therefore, a police officer should be permitted to frisk a suspect following an investigatory stop [based on reasonable suspicion] relating to drug activities.”), 99-0244 at p. 7, 756 So.2d at 460, quoting State v. Curtis, 96-1408, pp. 9-10 (La.App. 4 Cir. 10/2/96), 681 So.2d 1287, 1292. See also State v. Williams, 98-3059 (La.App. 4 Cir. 3/3/99), 729 So.2d 142 (officer’s testimony that he frisked a defendant suspected of drug activity to look for weapons for his own safety was sufficient to validate a frisk pursuant to La.C.Cr.P. art. 215[.1](B)). [Footnote omitted.]
Jones, 99-0861, p. 14, 769 So.2d at 38-39.
Finally, “the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer’s action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.” State v. Butler, 12-2359, p. 3 (La.5/17/13), 117 So.3d 87, 89.
In the present case, the combined knowledge, of the three officers, through the surveillance by one of them (Officer Jackson) was that a reliable confidential informant reported that a black male, described by the clothing he was wearing, |14was selling narcotics at a particular location in an area known for narcotics activity. Officer Jackson immediately went to that location and observed the described individual take something out of his sock and display it to passersby, engaging them. According to Officer Jackson, the object was white and, based on his experience with hundreds of narcotics surveil-lances and investigations, he believed it to crack cocaine. He believed that he was witnessing the defendant attempting to sell crack cocaine. Thus, Officer Jackson confirmed the reliability of the information received from the confidential informant.
Officer Jackson conveyed his observations and a description of the defendant to Officers Harris and Barnes, who proceeded to the location. For purposes of determining whether Officers Harris and Barnes had the requisite reasonable suspicion to stop the defendant, all the information possessed by Officer Jackson is imputed to those two officers. See State v. Weber, 13-1851, p. 2 (La.5/30/14), 139 So.3d 519, 522, citing and quoting United States v. Nafzger, 974 F.2d 906, 911 (7th Cir.1992); see also State v. Landry, 98-0188, p. 5 (La.1/20/00), 729 So.2d 1019, 1022.
Officer Harris, reasonably believing the defendant was committing the crime of possessing cocaine, approached the defendant, informed him of why he was being investigated, and patted down/ frisked the defendant for weapons and contraband. Officer Jackson admitted that he never saw any indication that Mr. Fields was carrying a weapon, and neither officer ever observed a weapon. However, the defendant was suspected of, at the very least, possessing cocaine, and having attempted to sell it, which was why he was *767 stopped. Thus, the pat down/ frisk was lawful under the drug-trade/weapons connection justification. Wilson, supra; Jones, supra.
| lsOfficer Harris testified that upon stopping the defendant, “I then conducted a pat-down of Mr. Fields for any weapons, any contraband.” La.C.Cr.P. art. 215 B, which authorizes the protective frisk for weapons, does not authorize a search for contraband. Nevertheless, given that because Officer Harris had lawful cause to conduct the frisk for weapons, the frisk was not rendered unlawful by his mention of both weapons and contraband as the purpose for the pat-down frisk.
Officer Jackson testified at the hearing on the motion to suppress, as to the protective pat-down frisk of the defendant by Officer Harris, that “once the officer felt the rock object that he immediately believed to be crack cocaine, he advised him of his Miranda rights and arrested him.... ” However, Officer Harris did not articulate at trial that what he described as the “large lump” detected in the defendant’s sock was a weapon, crack cocaine, or any other type of contraband prior to pulling open the defendant’s sock and retrieving it. Officer Harris testified that:
Once I got to his legs, I felt a large lump in the right side of his sock. At which time I advised him of his Miranda rights. Advised him of his Miranda rights, opened up his sock, took the object out, which I observed it to be, from my experience of 15 years police experience, to be compressed rock-like substance which is crack cocaine — consistent with crack cocaine.
Thus, Officer Harris’ testimony was that he did not recognize the “large lump” in the defendant’s sock as crack cocaine until he removed it from the sock and “observed it.”
In Minnesota v. Dickerson, 508 U.S. 366, 371, 113 S.Ct. 2130, 124 L.Ed.2d 334(1993), the Court addressed whether nonthreatening contraband detected through the sense of touch during a Terry pat-down frisk for weapons may be admitted into evidence. Analogizing to the “plain view” doctrine, the Court held that if a police officer lawfully pats down |1fia suspect’s outer clothing and feels an object whose contour or mass makes its identity as contraband “immediately apparent,” there has been no invasion of the suspect’s privacy beyond that already authorized by the officer’s search for weapons. Thus, the Court held the warrantless seizure of that object is justified by the same practical considerations that inhere in the plain-view context. Id., 508 U.S. at 375-76, 113 S.Ct. 2130.
In State v. Broussard, 00-3230 (La.5/24/02), 816 So.2d 1284, the frisking officer testified that, based on his many years of experience in narcotics enforcement, he knew “from the feel of the lumps and the crinkle of plastic in respondent’s pocket, that he had discovered rocks of cocaine and that he would place respondent under arrest even before he pulled the packet out of respondent’s pocket.” Id., p. 7, 816 So.2d at 1289. The Court held that the officer had thereby acquired his evidence by lawful means, citing and quoting Dickerson for the “plain feel” exception. Similar results were reached in State v. Francois, 00-1039, pp. 7-8 (La.App. 4 Cir. 1/10/01), 778 So.2d 673, 678-670; State v. Johnson, 94-1170, p. 7 (La.App. 4 Cir. 8/23/95), 660 So.2d 942, 948; State v. Bradley, 03-1518, pp. 9-10 (La.App. 4 Cir. 1/28/04), 867 So.2d 31, 36-37; and State v. Candlebat, 13-0780, pp. 12-13 (La.App. 4 Cir. 1/30/14), 133 So.3d 304, 311-312.
In the present case, Officer Jackson testified at the motion to suppress hearing *768 that once Officer Harris felt the rock object, he immediately believed it to be crack cocaine. However, Officer Jackson was not present at the time Officer Harris conducted the frisk, because he admittedly had driven away from the scene. The trial court cannot be faulted for accepting Officer Jackson’s testimony given at the motion to suppress hearing; he was the only witness to testify. However, Officer Harris’ testimony at trial was that he only determined that the “large lump” |17he felt in the defendant’s sock was crack cocaine after he removed it from the sock and “observed it to be, from my experience of 15 years police experience, to be compressed rock-like substance which is crack cocaine — consistent with crack cocaine.” Officer Harris’ testimony is totally inconsistent with him “immediately” recognizing by the “feel” of the “large lump” that it was crack cocaine. He did not make that determination until after he pulled out the object, and his testimony evidences that he arrived at that conclusion based, at least in part, on his visual inspection/observation of the object after he removed it from the sock. The identification of an object by visual inspection/observation is completely inconsistent with the “plain feel” exception to the search warrant requirement of the Fourth Amendment.
However, for the following reasons, the facts known to the police were sufficient to establish probable cause to arrest, and thus the evidence was lawfully seized. “Probable cause to arrest exists when the facts and circumstances known to the arresting officer, and of which he has reasonable and trustworthy information, are sufficient to justify a man of ordinary caution in the belief that the accused has committed an offense.” State v. Surtain, 09-1835, p. 7 (La.3/16/10), 31 So.3d 1037, 1043, quoting State v. Parker, 06-0053, p. 2 (La.6/16/06), 931 So.2d 353, 355. “[T]he test for probable cause draws upon the totality of the circumstances.” State v. Smith, 11-0312, p. 1 (La.2/21/11), 56 So.3d 232, citing State v. Aites, 10-0667 (La.5/28/10), 37 So.3d 993, 994. Given that a custodial arrest based on probable cause is a reasonable and lawful intrusion under the Fourth Amendment, a full search for weapons and/or evidence of crime requires no further justification. Surtain, supra.
| ^Considering the totality of the circumstances, Officer Jackson possessed probable cause to believe that the defendant had committed, and was then committing, a felony offense. His knowledge of probable cause was imputed to Officer Harris and Officer Barnes, who were part of the surveillance/take-down operation and were in communication with Officer Jackson. See Weber, supra.
Mr. Fields argues on appeal that the officers intended to arrest him and in fact immediately arrested him before discovering the crack cocaine. Whether or not the officers intended to or did immediately arrest essentially is irrelevant, however, as probable cause to arrest justifies a search even where there has been no arrest. Butler, 12-2359, p. 3, 117 So.3d at 88.
Therefore, ultimately, the evidence establishes that the rock of crack cocaine was lawfully seized from Mr. Fields. No merit exists to this assignment of error.
B.
In his second assignment of error, Mr. Fields argues that the trial court erred in denying his challenge for cause of prospective Juror Dormoy, who stated during voir dire of the second venire panel that she was more inclined to believe the *769 testimony of police officers.[2] Immediately following the colloquy, defense counsel then moved on to another juror without asking Juror Dormoy any other questions or raising a contemporaneous challenge.
|19A 15 October 2012 minute entry reflects that the defense exercised fourteen peremptory challenges for the twelve-person jury, for which two alternate jurors were also selected. Thus, the defense used all of its allotted twelve peremptory challenges, and presumably[3] one peremptory challenge for the selection of each of the two alternate jurors chosen.
The defense sought to challenge Juror Dormoy for cause during a “peremptory” challenge bench conference following voir dire of the second venire panel, after the jury had been preliminarily selected. The trial judge denied the challenge for cause because, she said, it should have been made during the actual voir dire of the second panel. In a four-page colloquy, defense counsel argued that the defense had not been informed that the trial court handled challenges for cause as the respective prospective juror was being questioned. The trial court pointed out that this had been the procedure during voir dire of the second panel, noting that all challenges for cause had been handled in open court, not at side bar. The trial judge also noted that one of the defense counsel, Ms. Anna Friedberg, had been in her courtroom before, and Ms. Friedberg admitted that she had one prior jury trial in that section of court. The trial court said it believed defense counsel knew the rule and that she had been put on notice.
The prosecutor then pointed out that defense counsel had appeared in that section of court for selection of a jury and trial in a case he identified by number and by the name of the defendant; he believed that trial had been on 26 and 28 June 2012. Additionally, the prosecutor pointed out that the state had made a number of | ^contemporaneous peremptory challenges in open court during the voir dire of both the first and second venire panels.
The voir dire transcript reflects that the state made six challenges for cause in the examination of the first voir dire panel and four in the second, all of which were made individually during the actual questioning of jurors. The defense made one challenge for cause in open court prior to making the one as to Juror Dormoy. All four of the state’s cause challenges made during voir dire of the second venire panel were made and disposed of prior to Juror Dormoy making the statements the defense later cited as grounds for its cause challenge.
In the first challenge for cause (made by the state during voir dire of the first panel), the trial court had asked if-there was a challenge for Juror Sandifer. The prosecutor responded in the affirmative, whereupon the trial court asked defense counsel if she had any questions. When Ms. Friedberg replied in the negative, the trial court granted the challenge for cause.
We note that when defense counsel objected for the record to the denial of her challenge for cause as to Juror Dormoy, *770 she argued in part that “throughout this jury selection when someone has said, ‘I cannot be fair and impartial,’ your Honor has jumped in and said, ‘Is anyone moving for cause.’ I was looking for your queue. You did not give me that queue. I thought we weren’t supposed to say anything at that time.”
However, that is inaccurate. The trial judge prompted only the first challenge for cause as to Juror Sandifer. The state made all its other challenges for cause without any “prompting” by the trial court or calls by the court for challenges for cause. The defense had also raised a challenge for cause prior to its challenge of Juror Dormoy without prompting from the court.
| ⅞1 After each challenge for cause by the state, the trial court asked the respective defense counsel handling the particular voir dire of that panel whether she had any questions. In only two of the ten state challenges did defense counsel reply that she had no questions. After the other eight challenges for cause, the prospective jurors were each thoroughly questioned by defense counsel concerning their views on the particular issues that had prompted the state’s challenges, primarily issues relating to prospective juror opinions/feelings about drug laws or police testimony. Such defense questioning of these jurors was clearly directed to establishing that in fact the particular juror could be fair and impartial to the state.
In making her voice known on the challenge issue, defense counsel, Ms. Janette Jurado, represented that the last time she had a jury trial in that section of court, the trial judge in the present case had entertained challenges for cause in the normal fashion, during an end-of-voir-dire challenge conference for the respective venire panels at which cause and peremptory challenges were both exercised. The trial judge responded to that plea by Ms. Jura-do by asking her if she had been present during the first round, to which question Ms. Jurado replied in the affirmative.
In sum, the record establishes that eleven challenges for cause were raised in open court prior to the completion of voir dire. Ten of these challenges were raised by the state and one by the defense. On each occasion, the court tendered the challenged juror to the opposing side for questioning and then, either granted or denied the challenge for cause. Juror Dormoy was questioned during this process in the same manner as all other jurors.
During questioning of the venire, defense counsel asked Juror Dormoy if she would “have to believe” police officer testimony “because he is a police officer.” |g2The juror responded in' the negative. This question was then presented to the rest of the panel.
Louisiana Code of Criminal Procedure article 795 provides that peremptory challenges must be made outside the hearing of the jury. The Code also requires that each party have the right to exercise peremptory challenges up until the full complement of jurors is seated and sworn. La.C.Cr.P. art. 799.1. Neither of these requirements is applicable to challenges for cause. Challenges for cause are governed by Louisiana Code of Criminal Procedure articles 788 and 795.
The Louisiana Supreme Court set forth the applicable law in State v. Juniors, 03-2425, pp. 7-9 (La.6/29/05), 915 So.2d 291, 304-305, as follows:
Louisiana Constitution article I, § 17 guarantees to a defendant the right to full voir dire examination of prospective jurors and to challenge jurors peremptorily. The number of peremptory challenges granted a defendant in a [case punishable by death or necessarily by *771 imprisonment at hard labor] is fixed bylaw at twelve. LSA-C.Cr.P. art. 799. When a defendant uses all twelve of his peremptory challenges, an erroneous ruling of a trial court on a challenge for cause that results in depriving him of one of his peremptory challenges constitutes a substantial violation of his constitutional and statutory rights, requiring reversal of the conviction and sentence. See State v. Cross, 93-1189, p. 6 (La.6/30/95), 658 So.2d 683, 686; State v. Bourque, 622 So.2d 198, 225 (La.1993), overruled on other grounds by State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16. Prejudice is presumed when a challenge for cause is erroneously denied by a trial court and a defendant has exhausted his peremptory challenges. State v. Robertson, 92-2660, p. 3 (La.1/14/94), 630 So.2d 1278, 1280; State v. Ross, 623 So.2d 643, 644 (La.1993). Therefore, to establish reversible error warranting reversal of a conviction and sentence, defendant need only demonstrate (1) the erroneous denial of a challenge for cause; and (2) the use of all his peremptory challenges. Cross, 93-1189 at 6, 658 So.2d at 686; Bourque, 622 So.2d at 225.
|MIn this case, each time a lawyer conducting the voir dire was concerned with a juror’s response to questioning, that lawyer immediately raised a challenge for cause. The challenged juror was then directly “tendered” to opposing counsel for questioning. After questioning by both sides, the court either granted or denied the challenge. On each occasion that the court granted a challenge, the challenged juror was released, and a new prospective juror was brought into the panel for questioning. It is apparent, then, that the court, in accord with La.C.Cr.P. art. 795, “temporarily accepted” Juror Dormoy well before the “peremptory” charge conference. Thus, the trial judge did not abuse her discretion in denying the defense challenge for cause as untimely.
The only statutory time restraint for the exercise of challenges for cause is contained in La.C.Cr.P. art. 795 A, which states that a juror shall not be challenged for cause after having been temporarily accepted pursuant to La.C.Cr.P. art. 788 A, unless the challenging party shows that the cause was not known to him prior to that time. That limitation is inapplicable in the present case.
On the record before us, we are unable to say the statement made by Juror Dor-moy would support a challenge for cause. Had a contemporaneous challenge for cause been made, both the state and defense would have had an opportunity for further questioning. Mr. Fields cites no constitutional, statutory, or jurisprudential authority that prohibits a district court in a criminal case from requiring contemporaneous challenges for cause. This procedure permits the other party to question the challenged juror on the particular issue for whiqh she/he is being challenged for cause.
Considering the facts and circumstances of the present case, we do not find that the trial court erred in its ruling. The state’s raising of ten challenges for cause |?/tprior to Juror Dormoy exhibiting any indication of an inability to be fair and impartial, and the participation by each defense counsel in the detailed examination of eight of those challenged jurors on the issues for which they had been challenged for cause, should have made the process being employed by the court obvious. Moreover, while Ms. Friedberg maintained that she had never heard the trial judge state that was her rule, she did not deny that she had previously tried a jury trial in that section of court, over which the trial judge in the present case presided. The prose *772 cutor cited the particular case by case number and the name of the defendant, and the dates of the trial — some four months prior to the present trial — and Ms. Friedberg had no response. It is significant, however, that the procedure employed by the judge was consistent with the Code of Criminal Procedure and was apparent throughout the selection process.
We find no merit to this assignment of error.
C.
In his third assignment of error, the defendant argues that his conviction by a non-unanimous jury violated his right to due process. Prior to trial defendant filed a motion to declare La. Const, art. I, § 17 and La.C.Cr.P. art. 782 A unconstitutional to the extent those provisions permit conviction by a less than unanimous jury (only ten of twelve jurors need concur to render a verdict) in a case such as the present one, in which the punishment is necessarily confinement at hard labor. The trial court denied that motion on the morning of trial.
The most recent pronouncement by the U.S. Supreme Court on the constitutionality of non-unanimous jury verdicts was in McDonald v. City of Chicago, Ill., 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), where, addressing the issue of the applicability to the States of the U.S. Constitution’s Second Amendment, the Court stated that it |25had “decisively held that incorporated Bill of Rights protections ‘are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.’” However, the Court noted in a footnote:
There is one exception to this general rule. The Court has held that although the Sixth Amendment right to trial by jury requires a unanimous jury verdict in federal criminal trials, it does not require a unanimous jury verdict in state criminal trials.
McDonald, 561 U.S. at 766 n. 14, 180 S.Ct. at 3036 n. 14.[4]
No Sixth Amendment right to a unanimous jury verdict is applicable to state criminal trials. See Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972); McDonald, supra. Both the Louisiana Supreme Court and this court have acknowledged that fact. See State v. Bertrand, 08-2215, p. 8 (La.3/17/09), 6 So.3d 738, 743; State v. Hankton, 12-0375, pp. 7-8 (La.App. 4 Cir. 8/2/13), 122 So.3d 1028, 1032, writ denied, 13-2109 (La.3/14/14), 134 So.3d 1193.
No merit to this assignment of error exists.
D.
In his fourth assignment of error, Mr. Fields argues that the trial court erred in denying his motion for new trial.
The defendant’s motion for new trial was primarily based on La. C.Cr.P. art. 851(3) and, alternatively, subsections (2) and (5).
La.C.Cr.P. art. 851 states, in pertinent part:
The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is lafiShown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
*773 The court, on motion of the defendant, shall grant a new trial whenever:
[[Image here]]
(2) The court’s ruling on a written motion, or an objection made during the proceedings, shows prejudicial error;
[[Image here]]
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty;
[[Image here]]
(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.
Mr. Fields’ motion for new trial as to all of the three grounds cited is based on evidence that Officer Jackson was arrested for forgery, a violation of La. R.S. 14:72, in connection with his submitting a forged college diploma to the NOPD in an effort to qualify for additional educational incentive pay. He was also suspended and terminated relative to that conduct, then apparently reinstated by the NOPD. The forgery charge was ultimately refused by the district attorney’s office. Mr. Fields contends that had such evidence been admitted at trial, it would have had a direct bearing on Officer Jackson’s credibility and would have changed the verdict of guilty. He further asserts that six months after his trial (before his sentencing), the Orleans Public Defender’s (“OPD”) office discovered Officer Jackson’s NOPD Public Integrity Bureau (“PIB”) file through its own efforts, which conclusively reflected his arrest for forgery and the resulting NOPD disciplinary action.
However, the issue of Officer Jackson’s arrest for forgery and the related NOPD disciplinary action against him was first raised immediately following 1270fficer Jackson’s trial testimony in this case. Outside the presence of the jury, the prosecutor informed the court that, approximately fifteen minutes earlier, Ms. Friedberg approached him to inquire as to whether Officer Jackson had a prior arrest or conviction for forgery. The prosecutor represented to the trial court that he was not aware of any such information. An OPD attorney, Ms. Louise Klaila, was present during this colloquy, and she informed the court that the OPD had received information concerning an internal NOPD disciplinary action against Officer Jackson for forgery relative to a college degree; a termination (later reduced to a suspension); and an arrest and booking for forgery. Ms. Klaila represented that she could find no docket master entry reflecting his arrest.
The trial court expressly found no Brady[5] violation by the state, accepting the prosecutor’s representation that the state knew nothing of this matter. The trial court continued the trial, stating that if the state was able to contact Officer Jackson, as the court had instructed the state to do, she would interrupt the proceedings. The record reflects that several more very brief discussions on the matter were held outside the presence of the jury as the trial proceeded. The state eventually obtained Officer Jackson’s rap sheet information, which reflected that forgery charges were refused in 2003. The trial court found that because the charges were refused and Officer Jackson was brought *774 back into full service, evidence pertaining to the prior incident was irrelevant.
Mr. Fields was found guilty of possession of cocaine on 16 October 2012. On 8 November 2012, he filed an application for issuance of a subpoena duces tecum directed to then NOPD Deputy Chief Arlinda Westbrook, PIB, seeking the “[e]ntire PIB File on former NOPD Officer Demetrius Jackson, Badge No. 821.” I^The subpoena duces tecum was issued by a judge from another section of Orleans Parish Criminal District Court on that same date.
On 26 November 2012, the state filed a motion to quash the subpoena duces te-cum, which motion was denied by the trial court on that date at the conclusion of a hearing on the matter. The state timely noticed its intent on 30 November 2012 to seek supervisory review in this court. This court granted the state’s filed writ application on 27 February 2013, reversing the trial court’s denial of the state’s motion to quash and quashing the subpoena. State v. Fields, 12-1716, unpub. (La.App. 4 Cir. 2/27/13). On the defendant’s application for writs, the Louisiana Supreme Court denied the request for relief as “moot.” State v. Fields, 13-0704 (La.5/29/13), 118 So.3d 382.
The record contains some NOPD disciplinary records which are presumably the ones discovered by the OPD on its own— after this court granted the state’s writ application and quashed the defendant’s subpoena duces tecum. These records were discussed at the 7 May 2013 hearing . on Mr. Fields’ motion for new trial and considered by the trial court in reaching its decision to deny the motion. An NOPD letter dated 15 November 2000 directed to Officer Jackson reflects a reprimand for his failure to wear his department firearm secured in a holster on a particular occasion while on plainclothes assignment, in violation of an NOPD rule. The defendant states in his brief that the state produced information as to this reprimand in mid-trial.
A 16 September 2003 NOPD “Notice of Suspension” states that Officer Jackson was suspended for 120 days for submitting an allegedly forged diploma from Southern University; the diploma was in response to a survey conducted funder orders of then NOPD Superintendent of Police, Edwin Compass, for the purpose of securing additional education pay for NOPD employees. That notice of suspension has “ARREST” stamped on it in bold lettering. A 1 April 2004 NOPD letter notifies Officer Jackson that then NOPD Deputy Superintendent, Warren Riley, had recommended a three-day suspension for a sustained violation of “Truthfulness” and dismissal from the department for a sustained violation of “Adherence to Law” relative to the crime of forgery. The last page of that 1 April 2004 letter of dismissal is not in the record. However, as previously set forth, when this issue came up at trial, the trial court stated that because ultimately the charges were refused and Officer Jackson was brought back into full service, evidence pertaining to the prior incident was irrelevant. Mr. Fields argues that Officer Jackson’s civil service appeal lasted through 2008, after which he was reinstated as an NOPD officer. Officer Jackson clearly was a fully commissioned member of the NOPD on 5 August 2011, the day defendant was arrested for the offense for which he was tried in the present case.
As previously stated, the primary ground asserted by the defendant in his motion for new trial under La.C.Cr.P. art. 851(3), is his discovery of new and material evidence that, notwithstanding the exercise of reasonable diligence, was not discovered before or during trial, and had such evidence been introduced at the trial, it would *775 probably have changed the verdict of guilty.
The defendant’s claim under La.C.Cr.P. art. 851(3) appears to be substantiated by the record, to the extent that Officer Jackson’s actual PIB file was not discovered by the defendant before or during trial. However, in denying the motion for new trial, the trial court expressly found that the defense failed to |snexercise due diligence in “researching the only State witness to the crime for which the defendant was charged.”
The substance of that PIB file was known to defense counsel at the time of trial, and a sixteen-page colloquy following Officer Jackson’s testimony (Officer Jackson was the first witness to testify at the trial) was devoted to the issue. The trial court considered during the trial (1) Officer Jackson’s arrest for forgery; (2) his resulting suspension and termination from the NOPD; (3) his subsequent reinstatement to the NOPD; and (4) the refusal of the forgery charges by the district attorney’s office. The trial court found no Brady violation by the state and ultimately ruled that because the charges were refused and Officer Jackson was subsequently reinstated, the matters were irrelevant.
Accordingly, the operative facts evidenced by the PIB file were known by the defendant early in the trial. A trial court has much discretion in ruling on a motion for new trial, and review of a trial court’s ruling thereon is limited to determining whether the trial court abused its discretion. State v. Simmons, 10-1508, p. 2-3 (La.App. 4 Cir. 2/15/12), 85 So.3d 743, 745; see also State v. Brisban, 00-3437, p. 12 (La.2/26/02), 809 So.2d 923, 931. Considering not only that the defendant knew of the substance of the PIB file at some point during the trial, but also that the trial court did, and that the court clearly based its ruling denying the admissibility of any such evidence on those facts, we do not find that the trial court abused its discretion in denying the motion for new trial as to the newly discovered evidence ground of La.C.Cr.P. art. 851(3) — solely for the objective reason that it was not truly newly discovered evidence.
| ai Further, in State v. Cavalier, 96-3052, pp. 3-4 (La.10/31/97), 701 So.2d 949, 951-952, the Court commented on the motion for new trial based upon newly discovered evidence affecting only a witness’ credibility, stating:
Newly discovered evidence affecting only a witness’s credibility “ordinarily will not support a motion for a new trial, because new evidence which is ‘merely cumulative or impeaching’ is not, according to the often-repeated statement of the courts, an adequate basis for the grant of a new trial.” Mesarosh v. United States, 352 U.S. 1, 9, 77 S.Ct. 1, 5, 1 L.Ed.2d 1, 5 (1956). Nevertheless, the court possesses the discretion to grant a new trial when the witness’s testimony is essentially uncorroborated and dispositive of the question of guilt or innocence and it “appears that had the impeaching evidence been introduced, it is likely that the jury would have reached a different result.” United States v. Davila, 428 F.2d 465, 466 (9th Cir.1970); accord United States v. Davis, 960 F.2d 820, 825 (9th Cir.), cert. denied, 506 U.S. 873, 113 S.Ct. 210, 121 L.Ed.2d 150 (1992); United States v. Taglia, 922 F.2d 413, 415-16 (7th Cir.1991); United States v. Harpster, 759 F.Supp. 735, 738 (D.Kan.), aff'd, 951 F.2d 1261 (10th Cir.1991); United States v. Lipowski, 423 F.Supp. 864, 867 (D.N.J.1976); see also State v. Bryan, 398 So.2d 1019, 1021-22 (La.1980) (on rehearing). In making this determination, the court may assume that the jury “would have known that [the witness] *776 had lied about the matter[.]” United States v. Stofsky, 527 F.2d 287, 246 (2nd Cir.1975), cert. denied, 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 80 (1976).
In the present case, Mr. Fields argues that Officer Jackson’s credibility (or the lack thereof) “was the defense.” He asserted in his motion for new trial that he was only convicted after five hours of deliberations; that the jury foreman, who the defendant cited by name, came to the court the day after the trial to express his disgust; and that juror, if called to testify, would state that most of the jury deliberation involved the credibility of Officer Jackson. However, we find no record evidence substantiating the duration of the jury deliberations, the jury foreman’s actions, or what he would testify to if called to testify. Mr. Fields was | ^charged with possession of cocaine with intent to distribute, but was convicted on a 10 to 2 verdict of the lesser offense of possession of cocaine.
Officer Jackson testified that he received the relevant information from a reliable confidential informant; that he set up the surveillance; that he observed the defendant take an object from his sock and display it to passersby in what the officer believed were apparent attempts to sell it; and that, based on his experience, the object was crack cocaine. However, importantly, Officer Jackson neither participated in the investigatory stop of the defendant, nor did he seize the cocaine. The primary thrust of Officer Jackson’s testimony was directed to establishing what led to the seizure of the crack cocaine and also to the issue of the defendant’s intent to distribute it. As to the issue of the defendant’s possession of the cocaine, Officer Jackson’s testimony can be viewed as merely cumulative to and corroborative of Officer Harris’s testimony.
However, the lawfulness of the seizure of the cocaine was not an issue before the jury. Further, the jury returned a responsive verdict of guilty of the lesser offense of possession of cocaine, substantially suggesting that it did not find the state met its burden of proving that the defendant possessed the rock of crack cocaine with the intent to distribute it. Proof that the defendant possessed the cocaine with the intent to distribute was dependent upon Officer Jackson’s testimony; the responsive verdict rendered indicates that the jury as a whole apparently rejected his testimony or his conclusion as to this issue.
We find that had the “new evidence” been introduced at the trial to attack Officer Jackson’s credibility it would not have changed the verdict, given this distinction between the issue of the lawfulness of the seizure of the cocaine and the issue of whether the defendant possessed the cocaine.
1 ^Therefore, we find no merit to the argument that the trial court erred in denying the defendant’s motion for new trial insofar as it was based on the discovery of new evidence under La.C.Cr.P. art. 851(3).
Mr. Fields’ first alternative argument set forth in his motion for new trial was that he was entitled to a new trial based on La. C.Cr.P. art. 851(2), that the trial court’s “ruling on a written motion, or an objection made during the proceedings, shows prejudicial error.” He cited: (1) the trial court’s denial of the defense request for a stay in the proceedings to permit the defendant to obtain and scrutinize Officer Jackson’s PIB file; (2) the trial court’s denial of his motion for mistrial following Officer Jackson mentioning that he “received information that a black male dressed in a gray shirt, black pants — ;” and (3) the trial court’s denial of *777 his motion for mistrial “following discovery of Officer Jackson’s PIB record.”
However, Mr. Fields does not cite on appeal the trial court’s denial of his oral motion to continue the trial in order to permit his defense counsel to obtain Officer Jackson’s PIB file. While he mentions the trial court’s denial of his motions for mistrial in his appellate brief, he does not cite those rulings as the basis of an argument that the trial court erred in denying his motion for new trial per La.C.Cr.P. art. 851(2). Mr. Fields appears to base his appellate argument as to the denial of his motion for a new trial only on the newly discovered evidence ground, La.C.Cr.P. art. 851(3), and on the “ends of justice” ground, La.C.Cr.P. art. 851(5).
Under La.C.Cr.P. art. 851(5), the trial court shall grant a defendant’s motion for new trial if the court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right. In reviewing a trial court’s ruling for abuse of its great discretion in granting or denying a motion for new trial grounded on La. _jC.Cr.P.34 art. 851(5), we keep two precepts in mind: (1) under this ground a trial court is vested with almost unlimited discretion, and its ruling should not be disturbed absent a palpable abuse of that discretion; and (2) La.C.Cr.P. 851 expressly states that “[t]he motion for new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case, the motion shall be denied, no matter upon what allegations it is grounded.” State v. Guillory, 10-1231, pp. 4-5 (La.10/8/10), 45 So.3d 612, 615.
In considering this ends of justice ground, as previously noted supra, in State v. Fields, 12-1716, unpub. (La.App. 4 Cir. 2/27/13), this court granted the state’s writ application and reversed the trial court’s denial of its motion to quash the defendant’s subpoena duces tecum for Officer Jackson’s PIB file directed to the NOPD. That writ decision was a considered decision on the merits, in which this court reviewed La. C.E. arts. 607, 608 B, and 609.1, relative to the introduction of character evidence to attack the credibility of witnesses. This court also stated that it previously had “visited the issues” before it in various forms, citing to four prior decisions: State v. Thompson, 08-0874, pp. 4-7 (La.App. 4 Cir. 4/8/09), 10 So.3d 851, 854-855; State v. Simmons, 10-1508, pp. 3-5 (La.App. 4 Cir. 2/15/12), 85 So.3d 743, 746-747; State v. Williams, 11-1298, p. 4 n. 2(La.App. 4 Cir. 6/20/12), 97 So.3d 428, 431, writ denied, 12-1672 (La.2/8/13), 108 So.3d 78; and State v. Joyner, 11-1397, p. 33-37 (La.App. 4 Cir. 10/24/12), 107 So.3d 675, 694-696, writ denied, 12-2494 (La.5/31/13), 118 So.3d 388.
In our writ, decision we concluded: “We do not find that the respondent has shown that the sought information that might be contained in the [sic] Officer Jackson’s PIB file will be admissible in his defense for the reasons he asserts.” Fields, 12-1716 at p. 4, 118 So.3d 382. Thus, we ultimately held that: “Based upon the codal particles and jurisprudence referenced above, we find the trial court abused its discretion by denying the state’s motion to quash the subpoena duces tecum resulting in an order for the entire PIB file of Officer Demetrius Jackson to be produced, to the defense.” Id.
The state argues in its brief that this court should apply the “law of the case” doctrine and refuse to consider the present assignment of error, based on this court’s considered writ decision, finding that Mr. Fields failed to show that the evidence of Officer Jackson’s forgery arrest and his NOPD disciplinary history *778 would be admissible to attack the officer’s credibility.[6] However, given the alleged newly discovered evidence and the ends of justice grounds for the granting of a motion for new trial, the defendant’s arguments are better addressed directly.
In the defendant’s motion based on the ends of justice per La.C.Cr.P. art. 851(5), he argued that the state’s failure to provide him with Officer Jackson’s PIB file constituted a Brady violation. Mr. Fields did raise a Brady objection during the colloquy at which Officer Jackson’s forgery arrest and NOPD disciplinary action was first discussed. He moved for a mistrial based on the alleged Brady violation, and the trial court denied the motion. This Brady issue was not raised by the defendant in his response to the state’s writ application in case number 2012-K-1716 on this court’s docket, and, consequently, it was not addressed/discussed by this court in its writ disposition.
| afiThe defendant cites the alleged Brady violation in arguing on appeal that the trial court erred in denying his motion for new trial based on the ends of justice. The Louisiana Supreme Court set forth the applicable law on the state’s duty to disclose evidence favorable to the accused in State v. Bright, 02-2793, pp. 5-6 (La.5/25/04), 875 So.2d 37, 41 — 42, as follows:
In Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that suppression by the prosecution of evidence favorable to the accused after receiving a request for the evidence violates a defendant’s due process rights where the evidence is material either to guilt or punishment, without regard to the good or bad faith of the prosecution. For purposes of the State’s due process duty to disclose, no difference exists between exculpatory evidence and impeachment evidence. State v. Kemp, 00-2228, p. 7 (La.10/15/02), 828 So.2d 540, 545. The Brady rule encompasses evidence which impeaches the testimony of a witness when the reliability or credibility of that witness may determine guilt or innocence. United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); State v. Knapper, 579 So.2d 956, 959 (La.1991).
Nevertheless, it is important to note that Brady and its progeny do not establish a general rule of discoverability, and not every case in which it is discovered post-trial that favorable evidence was withheld by the State will result in a reversal of the conviction. A prosecutor does not breach any constitutional duty to disclose favorable evidence unless the “omission is of sufficient significance to result in the denial of the defendant’s right to a fair trial.” United States v. Agurs, 427 U.S. 97, 108, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). For purposes of Brady’s due process rule, a reviewing court determining materiality must ascertain:
not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received *779 a fair trial, understood as a trial resulting in a verdict worthy of confidence. [Emphasis supplied.]
Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). See also, State v. Strickland, 94-0025, p. 38 (La.11/1/96), 683 So.2d 218, 234. Thus, the reviewing court does not put the withheld evidence to an outcome-determinative test in which it weighs the probabilities that the petitioner |S7would have obtained an acquittal at trial or might do so at a second trial. Instead, a Brady violation occurs when the “evi-dentiary suppression ‘undermines confidence in the outcome of the trial.’ ” Kyles, 514 U.S. at 434, 115 S.Ct. at 1566 (quoting Bagley, 473 U.S. at 678, 105 S.Ct. at 3381).
In the present case, the prosecutor represented to the trial court, shortly after the conclusion of Officer Jackson’s testimony as the state’s first witness, that he had no knowledge of an arrest or conviction of Officer Jackson for forgery. However, before conclusion of the testimonial part of the trial—a verdict was reached later that same date—the prosecutor had obtained Officer Jackson’s “rap sheet” which showed that the district attorney’s office had refused forgery charges as to Officer Jackson. It is undisputed that he had been arrested on that charge.
Regardless as to whether the prosecutor/ state was aware of Officer Jackson’s arrest, the state is not necessarily absolved of its responsibilities under Brady simply because the prosecutor does not possess or have knowledge of evidence. “[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government’s behalf in the case, including the police.” State v. Louviere, 00-2085, p. 13 (La.9/4/02), 833 So.2d 885, 896, quoting Kyles, 514 U.S. at 437, 115 S.Ct. 1555.
Nevertheless, a prosecutor does not breach any constitutional duty to disclose favorable evidence unless the “omission is of sufficient significance to result in the denial of the defendant’s right to a fair trial.” Bright, 02-2793, p. 6, 875 So.2d at 42, quoting Agurs, 427 U.S. at 108, 96 S.Ct. 2392. The crucial issue is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, meaning a trial resulting in a verdict worthy of confidence. Bright, 02-2793, p. 6, 875 So.2d at 42, citing Kyles, 514 U.S. at 434, 115 S.Ct. 1555.
IssOfficer Harris seized the cocaine from the defendant; his was the primary testimony establishing that the defendant possessed cocaine, the crime for which he was convicted. Officer Jackson never left his vehicle and left the scene by the time Officer Harris recovered the cocaine. Thus, on the issue of the defendant’s possession of cocaine, Officer Jackson’s testimony (that he had observed the defendant holding a white object he believed to be crack cocaine) was essentially corroborative of and cumulative to Officer Harris’s testimony. While Officer Jackson also testified that he observed the defendant attempt to sell the cocaine, the crime for which the defendant was being tried, the jury returned a verdict of possession. Thus, we find that the defendant did receive a fair trial, meaning one resulting in a verdict worthy of confidence even in the absence of Officer Jackson’s PIB file.
The record does not reflect that the state’s failure to turn over to the defendant the PIB file prior to or during trial was a factor in the trial court denying defendant the right to cross examine Officer Jackson concerning his forgery arrest and NOPD disciplinary action. Thus, Mr. *780 Fields has failed to show that the trial court abused its discretion in implicitly concluding that the ends of justice would not be served by the granting of a new trial in the present case based on any Brady violation by the state with regard to evidence of Officer Jackson’s arrest and disciplinary action.
Finally, in his written motion for a new trial, Mr. Fields asserted that he was entitled to a new trial under the “ends of justice” provision of La.C.Cr.P. art. 851(5), because he was denied his right under La. Const, art. I, § 16 to confront and cross examine the witnesses against him and his right to present a defense vis-a-vis his inability to present evidence of Officer Jackson’s forgery arrest and his [.^resulting NOPD disciplinary actions.[7] For the same reasons, the trial court did not abuse its great discretion in implicitly concluding that the ends of justice would not be served by granting a new trial because of any impact on Mr. Fields’ constitutional right to confrontation and to present a defense. We conclude that no merit exists in this assignment of error.
E.
In his fifth and final assignment of error, Mr. Fields asserts that in sentencing him as a habitual offender, the trial court “also ordered that he pay $276.50 in court costs or serve an additional thirty days for contempt.” He contends that the condition that he, an indigent, pay court costs or serve an additional thirty days for contempt makes the sentence unconstitutionally excessive.
However, while the state does not dispute Mr. Fields’ status as an indigent, it correctly notes that the transcript of the 31 July 2013 proceedings at which the trial court adjudicated the defendant a third felony habitual offender, vacated his original sentence, and sentenced him as habitual offender, does not reflect that the trial court ordered that the defendant pay the court costs “or serve an additional thirty days for contempt,” as asserted. Rather, the record reflects that the defendant was assessed costs at his original sentencing, and then, at his sentencing Lnas a habitual offender, the trial court stated: “Mr. Fields, you still owe court costs, $276.50. Failure to make that payment could result in contempt of court proceedings or 30 days in jail.”
“An indigent person may not be incarcerated because he is unable to pay a fine which is part of his sentence.” State v. Zabaleta, 96-2449 (La.3/7/97), 689 So.2d 1369, citing Bearden v. Georgia, 461 U.S. 660, 103 S.Ct. 2064, 76 L.Ed.2d 221 (1983).
However, the trial court did not sentence the defendant to thirty days in jail in default of payment of the fine. The trial court merely noted that nonpayment of the fine could result in defendant being sentenced to thirty days in jail. In the unlikely event the defendant would ever be sentenced to thirty days in jail for failing to pay the fine, he may seek relief at that time.
We find no merit to this assignment of error.
*781 Y.
For the foregoing reasons, the conviction and sentence and sentence of Harry L. Fields is affirmed.
AFFIRMED.

. Although Officer Harris testified that he was relayed the information that the defendant placed the white object back in his sock, Officer Jackson states that he did not see the defendant do that. It is unknown from whom this information came.

. The precise colloquy at issue is as follows: Juror Dormoy: I am more inclined to go with a police officer. I work for the sheriffs office in Jefferson Parish and I'm also married to a police officer.
Defense Counsel: Do you think that is going to affect your ability to be fair and impartial?
Juror Dormoy: Yes

. Neither the voir dire transcript nor any other transcript contained in the record contains a transcript of the exercise of peremptory .challenges. The appellant bears the burden of designating the record on appeal.

. Mr. Fields cites only part of the quote from the above-quoted footnote in McDonald in his appellate brief, stating that in McDonald, the Court said that, "[T]he Sixth Amendment right to trial by jury requires a unanimous jury verdict.”

. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

. Under the "law of the case" doctrine, an appellate generally refuses to reconsider its own rulings of law in a subsequent appeal in the same case. State v. Duncan, 11-0563, p. 26 (La.App. 4 Cir. 5/2/12), 91 So.3d 504, 520. This court has stated that it will not reverse its pretrial determinations unless the defendant presents new evidence tending to show that the decision was patently erroneous and produced an unjust result. Duncan, supra; State v. Gillet, 99-2474, p. 5 (La.App. 4 Cir. 5/10/00), 763 So.2d 725, 728. This rule applies when the appellate court grants a writ application and reverses a lower court’s decision, not when the appellate court denies the writ application.

. La. Const, art. I, § 16 states, in pertinent part:
Every person charged with a crime is presumed innocent until proven guilty and is entitled to a speedy, public, and impartial trial in the parish where the offense or an element of the offense occurred, unless venue is changed in accordance with law. No person shall be compelled to give evidence against himself. An accused is entitled to confront and cross-examine the witnesses against him, to compel the attendance of .witnesses, to present a defense, and to testify in his own behalf.